## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA

## CIVIL RIGHTS COMPLAINT FORM
## 28 U.S.C. 1331 OR 1346
## 42 U.S.C. 1983 AND BIVENS ACTION

Myra Catherine Solliday
#28076-004
    Plaintiff,

Vs.                                          Case No.: 4:07cv363-RH/WCS

                                                Jury Trial Demanded

1. Federal Prison Guard, L. Spence,
2. Federal Prison Guard, G. Dixen,
3. Federal Prison Guard, J. Knight,
4. FCI Tallahassee Warden, Ms. Rivern,
5. FCI Tallahassee Captain, Mr. Horton,
6. Director of Bureau of Prison, Harley B. Lappin,
7. SIS Investigator, George Williams

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
TALLAHASSEE, FLA.

2008 MAR 17 PM 1: 27

FILED

I.     PLAINTIFF:

<u>Myra Catherine Solliday</u>
<u>#28076-004</u>
<u>FCI Dublin</u>
<u>5701 8th St. Camp Parks</u>
<u>Dublin, CA 94568</u>

II.    DEFENDANTS:

1) Levon E. Spence
   Former Prison Guard
   FCI Tallahassee

2) G. Dixen
   Former Prison Guard
   FCI Tallahassee

3) J. Knight
   Former Prison Guard
   FCI Tallahassee

4) Ms. Rivera,
   Former Warden
   FCI Tallahassee

5) Mr. Horton,
   Former Captain
   FCI Tallahassee

6) Harley B. Lippin,
   Director of the
   Bureau of Prisons
   320 First Street NW
   Washington, DC 20534

7) George Williams
   SIS Investigator,
   501 Capital Circle NE
   Tallahassee, FL 32301

2

III.   EXHAUSTION OF ADMINSTRATIVE REMEDIES

Plaintiff has exhausted all of the administrative remedies available to her.

IV.   PREVIOUS LAWSUITS

 A. Have you initiated other actions in state court dealing with the same or similar facts/issues involved in this action?
    Yes ( )  No (X)

 B. Have you initiated other action in federal court dealing with the same or similar facts/issues involved in this action?
    Yes (X)  No ( )

  1. Parties to previous action:
   a. Plaintiff(s):  Myra Catherine Solliday
   b. Defendant(s):  FCI Tallahassee
  2. District and judicial division: Southern District of Florida
  3. Name of Judge: Donald Graham   Case#:
  4. Approximate filing date: November 30, 2006
  5. Date of dismissal: Between March and May 2007
  6. Reason for dismissal: Improper filing
  7. Facts and claims of case: Requesting information concerning being placed in the Special Housing Unit under investigation.

  a. Have you initiated other actions (besides those listed above in Questions (A) and (B)) in either state or federal court that relate to the fact or manner of your incarceration (including habeas corpus petitions) or the conditions of your confinement (including civil rights complaints about any aspect of prison life, whether it be general circumstances or a particular episode, and whether it involved excessive force or some other wrong)?
    Yes (X)  No ( )

  1. Parties to previous action:
   a. Plaintiff(s):  Myra Catherine Solliday
   b. Defendant(s):  FCI Tallahassee
  2. District and judicial division: Northern District of Florida
  3. Name of Judge: R. Hinkle  Case #:
  4. Approximate filing date: April or May 2006
  5. Date of dismissal: Sept. or Aug. 2006
  6. Reason for dismissal: Transferred to FDC Miami
  7. Facts and claims of case: Requesting information concerning being placed in the Special Housing Unit under investigation.

  b. Have you ever had any actions in federal court dismissed as frivolous, malicious, failing to state a claim, or prior to service? If so, identify each and every case so dismissed:
    Yes ( )  No (X)

## V. STATEMENT OF FACTS:

7) In Sept. of 2003, or Sept. of 2004, officer Spence entered my room and called me down stairs to his office. When I entered the office he embraced me and kissed me. He then locked the door, when he came back he began kissing me. This took place after months of him telling me how much I meant to him, and how peaceful and good he could make my life there. He then pressed me against the wall and pulled my shorts down. I'm ashamed to say that he had sex with me. Afterward, he stated that he hoped he did not get any "semen" on me. He then went into his office. I pulled my shorts up, and by the time I walked around the door to his office, he was holding a large pack of chewing gum that he handed me. I was dumbfounded, he took several pieces out and gave them to me. He then said it was almost count time, 3:am, and I should go up to my room. I walked back to my room in a daze, when I got there I held out my hand and looked at the gum. I felt numb. I flushed the gum down the toilet and began crying. I felt so dirty and used. I was so ashamed. He then came to my room and asked me if I was all right and kissed me. He said that he didn't mean it the way it sounded when he mentioned the semen. He kept asking me if I was all right. He once again made me feel like he really cared about me. After that night, he subtly became more and more distant. I then began to see him with other women, involved in activities that he was ultimately convicted of. I was devastated. He told me on several previous occasions that it would do me no good to tell anyone because no one would believe me, and I would end up being punished. Which is exactly what has happened.

8) Around the middle of 2004, officer Dixen began working in F-unit. He would give me helpful hints and tips on exercising. At first he would help me with correct form and posture for weight lifting by placing his hands on my back and waist, ending or straightening me as need be. On occasion he would share some of his dinner with me. One night I went to his office and we were talking about abs, he began touching me abs,

4

showing me where and how the muscles separate and develop. The touching became more aggressive and wound up below my waist line, then the touching became even more intrusive and he inserted his finger inside me, pulling my pants down. He also made me touch his penis, telling me where he wanted to place it. He told me to come back to his office later that night after count, but when I didn't come back, he was upset. Some months later, officer Spence came to my room and told me that officer Dixen was making extremely derogatory statements regarding me, that I should stay away from him because he was "out to get me."

9) That is something else the officers did, drag you through the mud with certain officers and the other inmates, making them give you a hard time.

10) Officer J. Knight started harassing me in late 2004, early 2005. At first he would follow me in the kitchen (dining hall), when he worked the compound. He would always stop me and pat me down. After a while the pats became very uncomfortable, he would run his hands slowly over my body, my rib cage, under my bra, waist, stomach, hips, down my legs, then back up. It would always appear to be regular procedure, but it didn't feel regular. Sometimes he would have a metal detector and comments would be made by him about playing with sex toys. He worked 2 quarters in my unit (F-unit), back to back. He would always bring me my mail to my room and sit and talk with me. Whenever I would come into the unit he would stop me and pat me down. Then he would always tell me how much he liked touching my body. Sometimes when I would come out of the shower, he would be sitting in my room waiting for me. He would touch my legs and started going up higher. He always wanted me to touch his penis. Then he started talking about oral sex, and that's when I got really scared and I started trying harder to stay away from him. He would tell me that when I least expected it he would surprise me with arranging somehow to be alone with me, that I wouldn't know when or where it would happen but it would happen. He said that he had ways of making it happen. On

5

two occasions he sat in on a counseling meeting I used to have with Mr. Bearbaum, a counselor in the long timers' group I attended. I don't know if he was trying to intimidate me, or if he was letting me know that I couldn't get away from him. He would tell me how the Lt.'s and Administrative staff always did what he wanted them to do, and how he would harass and torment different inmates that "gave him a hard time" and how the staff would back him up.

11) In hindsight, it seems that the corrupt officers had a network within the prison. They all seemed to know everything about one another, and which of the women were most vulnerable. A conspiracy and collusion to see which one of them could out do the other with using and abusing the women.

12) On January 10, 2006, I was placed in the Special Housing Unit (SHU) in Tallahassee, under investigation. I was kept in the SHU for a full six months, (180 days), even after I cooperated fully and extensively, pertaining to the involvement of the three officers mentioned in this complaint, without complying with the proper procedures of due process.

13) At first I denied any involvement because I was afraid, ashamed and humiliated. Afraid of retribution from the officers involved, and afraid of being transferred away from my children, and punished. However, after reflecting on what the investigators stated to me about being violated and raped, I finally began to cooperate completely with their investigation, giving them sworn statements describing the abuses and the officers involved. I began cooperating with the investigation approximately three months before I was transferred to FDC Miami.

14) However, once it was discovered that I was not involved in receiving any type of contraband, I was completely disregarded.

15) I feel no less violated and raped by the process of the way this investigation was conducted, and by the way my transfer was made, as by the officers' taking advantage of

6

my vulnerabilities of being incarcerated so many years, under their complete authority and control.

16) My psychological and emotional needs were ignored until I was in FDC Miami, where I was prescribed antianxiety and antidepressants to medicate the emotional distress I am suffering.

Even now, I am requesting to be treated by a psychologist, to no avail. I am no longer taking any medication. I need to receive psychological treatment in order to try and overcome what I am suffering as a direct result of this entire ordeal.

17) I was transferred as a ruse, in the middle of the night, like some kind of major sting operation. That in itself was emotionally and psychologically devastating. Capriciously and arbitrarily decided, with complete deliberate indifference to the safety and well being of any of the women transferred, and without proper procedures of due process applied, in order to make it look like something was being done in response to the unfortunate and fatal shooting that occurred June 21, 2006.

18) I was then transferred all the way across the world to FCI Dublin, as a punishment. I will never be able to see my family so far away from my home.

19) While in the SHU in Tallahassee, I was approached by Mr. George Williams, the SIS investigator in a manner that is inappropriate. He suggested that I would be released back out to the compound if I would "help" them, he also suggested for me to wear a wire while I was confined in the SHU, in order to get more information from the officers involved.

20) Both officers, E. Lavon Spence and G. Dixen, worked the SHU while I was confined there, also placing me in a dangerous situation. V. Johnson also worked the SHU during the time I was there. He spoke with me one day, telling me not to say anything about my involvement with any of the officers involved with why I was under investigation. I sent Mr. George Williams a cop out telling him about the incident. I agreed to "help" them in

7

any way I could, but as I stated earlier, once it was discovered that I was not involved in any contraband, I was then totally disregarded and ignored.

21) I was transferred to FDC Miami with 14 other women, "conveniently filling the magic number of 15, which happened to be the exact number of women in the indictment against the five remaining officers. That placed us in a very dangerous situation. It appeared that "we" were the witnesses that were actually part of the indictment. Which is exactly how we were treated once we were placed in FDC Miami. We were gawked at, ridiculed, insulted, and treated with contempt, by other inmates as well as the staff and officers at FDC Miami.

22) The women that were in the indictment because of their involvement with receiving contraband were immediately transferred to camps and institutions closer to their homes and families.

23) After the officers were convicted, the women also received sentence reductions as well as other various conveniences for their cooperation.

24) Lynn Hartline, one of the witnesses, was given immediate release from FCI Dublin, on or about May 12, 2007. While I am continuing to be punished, unable to see my children, because I was sexually abused by the officers involved, but did not receive any contraband.

25) The warden, Ms. Rivera, treated me with contempt and disregard. She was aware of everything that was happening, including the method of placing women back out on the compound after having been assaulted by these corrupt prison guards, in order to glean more evidence against them.

26) Captain Horton was the designated Segregation Review Official (SRO) at that time, making him as culpable as the warden and the SIS Lt. George Williams. That is total deliberate indifference and abuse of discretion on the part of the warden, George

8

Williams, and Captain Horton. They did not follow procedures set in place for Administrative Detention.

27) I filed a request through the Information of Privacy Act, for all related documentation, and even filed in court for any information pertaining to being housed in SHU under investigation, all to no avail. The response to the agency of Information was that I was not under any investigation.

28) The Director of the Bureau of Prisons has also demonstrated gross deliberate indifference, and abuse of discretion regarding the overall circumstances. Unfortunately, these methods of grossly abusing the due process are widely used in prisons.

29) I wrote directly to the Director, Mr. Lappin, concerning everything that has taken place, and he chose to disregard my plea for intervention and help.

VI. STATEMENT OF CLAIMS:

30) 18 U.S.C. 2241: Aggravated sexual abuse; 18 U.S.C. 2242: Sexual abuse; 18 U.S.C. 2243: Sexual abuse of a minor or <u>ward</u>; 18 U.S.C. 2244: Abusive sexual conduct: (a) By force or threat. Whoever, in the special maritime and territorial jurisdiction of the U.S. or in a "Federal Prison," knowingly causes another person to engage in a sexual act – (1) by using force against that other person; or (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping; will be subjected . . .

31) Corrections officer was not entitled to qualified immunity with respect to prisoner's 42 U.S.C. 1983 Eighth Amendment claim alleging that officer sexually assaulted and harassed prisoner because any reasonable prison official would have known that to try to force unwanted and prohibited sexual act on inmate was objectively unreasonable and in violation of inmate's rights. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. 1982. See <u>Thomas v. District of Columbia</u> 887 F.Supp. 1.

32) U.S.C.A. Const.Amend. 5; 18 U.S.C. (182 Ed.) 4082: Although federal prison authorities have wide ranging discretion to determine inmate's place of confinement, warden's decision may be subject to reversal if it constitutes an "abuse of discretion" or an unlawful "deprivation of a right protected by the due process clause."

33) Policy Statement 5270.07: 2. Protection cases; CFR 541.23: [c. Ordinarily, staff may place an inmate in Administrative detention as provided in paragraph (a) of their rule relating to protection cases, for a period not to exceed 90 days. Staff shall clearly document in the record the reasons for any extension beyond this 90-day period.] Inmates in Categories a (1-5) of this section (on protection cases) are not to be extended beyond 90 days unless there are exceptional circumstances and approval is obtained from the appropriate Regional Correctional Services Administrator. [d. Where appropriate, staff shall first attempt to place the inmate in the general population of their particular

facility. Where inappropriate, staff shall clearly document the reason(s) and refer the case, will all relevant material, to their Regional director, who, upon review of the material, may order the transfer of a protection case.]

34) Captain Horton was the designated Segregation Review Official (SRO) at that time, making him as culpable as the warden and the SIS Lt. George Williams.

35) Fourteenth Amendment: prohibits the deprivation of liberty or property without due process of law.

36) Thirteenth Amendment: Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

37) The plaintiff was not convicted nor charged with any crime, yet she was unjustly transferred to FDC Miami, then ultimately to FCI Dublin. The punishment being in relation to the FDC status, which is a lock down detention facility, and the distance from her home and family. Part of the inmate custody scoring system involves the inmates involvement with outside resources, i.e., family and community ties.

38) The Bureau of Prisons is held liable according to 19 U.S.C. 4042: Duties of the Bureau of Prisons: (a) In general. - The Director of the Bureau of Prisons, under the direction of the Attorney General, shall – (1) Have charge of the management and regulation of all Federal penal and correctional institutions; (2) provide suitable quarters and provide for the safe keeping, care and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States; (4) provide technical assistance to State and local government in the improvement of their correctional systems; and (5) provide notice of release of prisoners in accordance with subsections (b) & (c).

39) Deliberate Indifference: under this standard an official or municipality acts with deliberate indifference if its conduct (**or adopted policy**) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights. Hovater v. Robinson, 1 F.3d 1063, see also Helling v. McKinney, 125 L.Ed.2d 22.

40) The warden, the Captain, and George Williams, all acted with complete deliberate indifference in using the women at FCI Tallahassee, after discovering we had already been sexually abused and violated, in order to try to further incriminate the corrupt officers under investigation by requesting, and in some cases placing, the women back out on the compound to glean more evidence.

41) U.S.S.G. Revision 1B1.13: Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. 3582(b)(1)(A), the court may reduce a term of imprisonment if, after considering the factors set forth in 18 U.S.C. 3582(a), to the extent that they are applicable, the court determines that- (1)(A) extraordinary and compelling reasons warrant the reduction; or (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. 3582(g) . . . I wrote directly to the Director of the Bureau of Prisons, he chose to disregard my plea for intervention. **Even if the conduct is otherwise prohibited, the failure of the BOP, the warden, and her staff to safeguard against known unconstitutional conduct may amount to a tacit approval of the conduct. See Women Prisoners of the District of Columbia Dep't of Corrections v. D.C. 877 F.Supp. at 662.

42) Prison Policy Nos. 493.18.01 and 493.18.03 provide set regulations for the criteria of placing and scoring inmates. There are rules that are put in place to be followed. No policy was followed in the manner in which they transferred us to FDC Miami. The facility itself was not prepared to receive the 15 women that were sent to them unexpectedly.

43) Retaliation for reporting complaints of, assisting any individual in making a report of, or cooperating in an investigation of sexual harassment, regardless of the merits or the disposition of the underlying complaint. Retaliatory conduct includes the following actions taken against a prisoner in response to that prisoner's complaint of sexual harassment . . . : disciplining, changing work or program assignments of, transferring to another facility or, placing under involuntary protective custody any prisoner. Thus due process rights were violated. See, Women Prisoners, 877 F.Supp. 662, Prison Policy Nos. 493.18.01 and 493.18.03.

44) 18 U.S.C. 4042: Prison authorities have wide discretion to decide on appropriate methods of handling their wards, but such discretion is not unlimited and, if paramount federal constitutional or statutory rights come in to play, prison regulations must conform to them. See Mathews v. Hardy 420 F.2d 607.

45) Due Process violation: Plaintiff asserts that the decision to transfer her to FDC Miami, and the method in which it was done, was arbitrary, capricious, and politically motivated. She also contends that the decision deprived her of a constitutionally protected liberty interest without due process of law.

46) The warden, the captain, and the SIS Lt. George Williams, abused their authority and discretion, unlawfully depriving the plaintiff of a right protected by the Due Process Clause.

47) Further violation occurred when the plaintiff was ultimately transferred to FCI Dublin, which is so far away from her home and family that she will never be able to see her children as long as she remains there.

48) Policy Statement 5100.07 (7)(b): Transfer to a facility in an area other than the inmate's legal residence or sentencing district. This provision is meant to insure the inmate will remain close to her family and community ties, so as to assist in the rehabilitation process.

49) The distance of her transfer has proven to be an additional punishment to her. Procedures were arbitrary and capricious, rendering them Constitutionally deficient.

50) Prison officials "cannot avoid their due process responsibilities simply by relabeling the punishments imposed on prisoners." See Taylor v. Clement 433 F.Supp. 585.

51) 42 U.S.C. 1981: Equal rights under the law; All persons within the jurisdiction of the U.S. shall have the same right in every State and territory to make and enforce contracts to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by . . . The plaintiff was discriminated against when she was not given the same opportunity to be a witness for being sexually abused by the prison guards convicted of corrupt and unlawful activities as the women that were given the opportunity to testify regarding their involvement. Which were also granted the "benefits of all laws" of said proceedings.

52) 42 U.S.C.S. 1981 is used as parallel basis with 42 U.S.C.S. 1983 and 2000e-5 for relief from "disparate treatment" in [ ] elements of violation are identical with those of 1983 and 2000e-5, and in such cases intent purposefully to discriminate should be inferred under 1981 and 2000e-5.

53) Plaintiff was discriminated against when they chose not to acknowledge her involvement and testimony in the case against the officers' trial. The plaintiff was sexually abused and assaulted. Her constitutional rights were and are continuing to be grossly violated by the way she has been and, is continuing to be disregarded.

54) U.S.C.A. Const.Amends. 5, 14, 42 U.S.C. 1981: Threshold inquiry in evaluating equal protection claim is to determine whether person is similarly situated to those persons who allegedly received favorable treatment. The plaintiff was not treated equally to those women suffering less of the same violations, or involvement, because there involvement also included receiving illegal contraband of alcohol, drugs, perfume, various articles of clothing, etc. Making their testimony more appealing to the prosecutor and investigator.

These women have gotten immediate release, i.e., Lynn Hartline, and various additional favorable treatments.

55) Emotional, Psychological distress, mental pain and anguish. Plaintiff's 8th Amendment rights were also violated by her 180 days in involuntary confinement, she suffered severe mental pain and anguish, as well as psychological and emotional distress.

56) She is also suffering from the emotional distress of the knowledge that she will never be able to see her family being housed in California, so far away from her home and family.

57) U.S.C.A. Const.Amend. 8: Severe or repetitive sexual abuse of inmate by prison officer may be "objectively, sufficiently serious" enough to constitute Eight Amendment violation, as sexual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm. See, Women Prisoners v. District of Columbia 93 Federal Reporter, 3d Series, 910.

58) U.S.C.A. Const.Amend. 8. Sexual abuse of prisoner by corrections officer has no legitimate penological purpose and is not part of penalty that criminal offenders pay for offenses against society; thus, the abuse itself may be sufficient evidence of culpable state of mind to meet subjective element of test of Eighth Amendment violation, even without considering what mens rea is necessary to show "wanton" state of mind for claim of sexual abuse. Women Prisoners v. District of Columbia, at 910.

59) Liberty interests protected by Due Process Clause: The touchstone of due process is protection of the individual against arbitrary action of government, see Dent v. West Virginia, 129 U.S. 114, 32 L.Ed 623.

60) The coercive nature of [officers] duties exerts compelling pressures on inmates which undermine their free will. See Fisher v. Goord, 981 F.Supp. 140, 172 (an inmate might feel compelled to perform sexual favors for correction officers in order to be on the officer's "good side" . . . which is . . . quid pro quo behavior [that] is inappropriate, despicable and serves no legitimate penological purpose.

61) An inmate, by definition, relinquishes her liberty and submits herself to the control of guards and other officials in similar roles. See <u>Smith v. Cochran</u> 216 F.Supp.2d 1286.

62) Infliction of emotional distress: As a matter of law, the prison guards' conduct rises to the level of extreme and outrageous conduct under <u>Eddy v. Brown</u>, 1986 OK 3, 715 P.2d 74 (Okls. 1986). The prison guards' activity of demanding sexual relations with the inmates in order for them to be granted extra privileges was so egregious and outrageous that it goes beyond the bounds of common decency and is utterly intolerable. See <u>Smith v. Cochran</u> 216 F.Supp.2d 1286.

63) Temporal proximity alone may be significant enough to constitute indirect evidence of a casual connection so as to create an inference of retaliatory motive in an inmate's 1983 action against a correctional officer. See <u>Muhammad v. Close</u> C.A. 6 2004, 379 F.3d 413.

64) Atypical and significant hardship, see <u>Sandin v. Connor</u> 132 L.Ed 2d 418.

65) Retaliatory Transfer, see <u>Nei v. Docley</u> 372 F.3d 1003, also <u>Osterback v. Kemp</u> 300 F.Supp. 2d 1238.

66) Conspiracy and collusion: All of the officers involved knew what was going on with all of the women involved, including myself. Not until officer Spence took advantage of me did the officers begin to approach me in any way. Even a statement by George Williams and the OIG officer, Jeff Brunner, suggested such a conspiracy. They stated: "there was a hand full of officers covering up for, and protecting one another."

67) Courts have repeatedly recognized that because no legitimate law enforcement or penological purpose can be inferred by the sexual abuse by a prison official, the sufficiently culpable state of mind is present to violate the prisoner's constitutional rights. Actions that demonstrate the use of excessive force sufficiently prevalent to demonstrate a pattern which resulted in alleged injuries that are objectively "harmful enough" to implicate the Constitution. See <u>Hudson v. McMillian</u>, 117 L.Ed.2d 156, "deprivation

17

which amounts to a wanton and unnecessary infliction of pain . . . [physical and mental] . . . which is so malicious that it violates contemporary standards of decency . . . " Women Prisoners v. District of Columbia 877 F.Supp. 634, 664-65.

68) The Supreme Court has reiterated that "inmates retain those First Amendment rights [and other constitutional rights] that are not inconsistent with [their] status as prisoner[s]." Pell v. Procunier, 41 L.Ed.2d 495, following this line of reasoning the Tenth Circuit held in Hovater v. Robinson, 1 F.3d 1063, that "an inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards." Id. At 1068.

69) Along with recognizing a constitutional violation of Eighth Amendment rights, the court recognizes an additional violation of federal law. 42 U.S.C. 1983 "authorizes suits against State and local officials based upon federal statutory as well as constitutional rights." 122 Cong.Rec. 35122 (1976). "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." United States v. Lanier, 520 U.S. 259, 137 L.Ed.2d 432 (1997).

70) In order to survive motion to dismiss for failure to state claim upon which relief can be granted, plaintiff must assert cognizable claim and allege facts that, if true, would support claim; in evaluating whether these requirements are met, complaints prepared pro se are held to less stringent standards than formal pleadings drafted by lawyers. FedRules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

VII.   RELIEF REQUESTED:

71) Lost wages for time in the SHU and in transit of        $        3,263.80

72) Compensatory damages of                                  $      725,000.00

73) Punitive damages of                                      $      725,000.00

74) Declaratory relief

75) Equitable relief

76) Relief in prison term according to U.S.S.G 1B1.13

77) Transfer to a facility closer to home and family.


**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS OF FACT, INCLUDING ALL CONTINUATION PAGES, ARE TRUE AND CORRECT.**
**28 U.S.C. 1747**


March 10, 2008                                    Myra C. Solliday
_____                                   _____
     Date                                          Signature of Plaintiff


   I declare (or certify, verify, or affirm) under penalty of perjury that this complaint was delivered to prison officials for mailing on: the 10th day of March, 2008.

   Litigation is deemed FILED at the time it was delivered to prison Authorities.
See: Houston v. Lack 101 L.ed.2d 245 (1988).



                                                  Myra C. Solliday
                                                  _____
                                                  Myra Catherine Solliday
                                                  #28076-004
                                                  Federal Correctional Institution
                                                  5701 8th St. Camp Parks
                                                  Dublin, CA 94568


18