**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**MYRA CATHERINE SOLLIDAY,**

      **Plaintiff,**

**vs.**                                  **Case No. 4:07cv363-RH/WCS**

**OFFICER SPENCE, et al.,**

      **Defendants.**

_____/


## THIRD REPORT AND RECOMMENDATION[1]

Two summary judgment motions remain pending in this case.[2]  The first motion

was filed by Defendants Lappin, Rivera, Horton, and Williams.  Doc. 80.  The *pro se*

Plaintiff also filed her own amended motion for summary judgment.  Doc. 89.  The

parties were advised of their obligations to respond to the opposing motion, docs. 82, 84

and 90.  Plaintiff filed her response to the Defendants' motion on February 9, 2009, doc.

---

[1] The first report and recommendation, doc. 52, entered in this case denied Defendant Knight's motion to dismiss, doc. 47.  It was adopted.  Doc. 65.  The second report and recommendation, doc. 95, denied the summary judgment motion filed by Defendant Knight, doc. 68.  That was likewise adopted.  Doc. 99.

[2] The remaining motions to be decided are:  (1) summary judgment motion filed by Defendants Williams, Rivera, Horton, and Lappin, doc. 80; (2) Plaintiff's amended motion for summary judgment, doc. 89.  Defendants are reminded of the February 27, 2009, deadline to respond to Plaintiff's amended summary judgment motion, doc. 89.

92, and Defendants Williams, Rivera, Horton, and Lappin, filed their response on

February 13, 2009. Doc. 94. Defendant Dixon, doc. 97, and Defendant Knight, doc. 98,

also filed responses to Plaintiff's motion. Both motions are considered in this report and

recommendation.

**Allegations of the Second Amended Complaint, doc. 36**[3]

Plaintiff's second amended complaint, brought pursuant to <u>Bivens</u>,[4] alleges that

Defendant Spence, a correctional officer employed by the Bureau of prisons (hereinafter

"BOP"), sexually assaulted Plaintiff in the Defendant's office at FCI, Tallahassee in

September of either 2003 or 2004. Doc. 36, p. 4. Defendant Dixon, a correctional

officer, is alleged to have also sexually assaulted Plaintiff sometime in 2004. *Id.*, at 4-5.

Defendant Spence then allegedly warned Plaintiff to stay away from Defendant Dixon

because he was "out to get" her. *Id.*, at 5.

Plaintiff alleges that Defendant Knight began "harassing" her in "late 2004, early

2005." *Id.*, at 5. Plaintiff alleges he physically touched her, made suggestive and

inappropriate comments to her, and allegedly told Plaintiff he could harass inmates who

gave him a hard time because staff would back him up, and then he "sat in on a

counseling meeting" she had, suggesting to her that she "couldn't get away from him."

*Id.*, at 5-6.

Plaintiff alleges that on January 10, 2006, she was placed in the Special Housing

Unit (SHU) for an investigation. *Id.*, at 6. At first Plaintiff denied her involvement due to

---

[3] These allegations are the same as previously stated in the first report and recommendation, doc. 52, pp. 3-4.

[4] <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

fear, but then eventually began fully "cooperating with the investigation approximately three months before [she] was transferred to FDC Miami." *Id.*, at 6. Plaintiff claims that when it was clear that she was not involved in receiving contraband from the officers, she "was completely disregarded" by unnamed persons, but presumably by those officials conducting the investigation. *Id.* Plaintiff alleges that Defendant Williams, the SIS investigator, conducted the investigation "in a manner that is inappropriate." *Id.*, at 7. Plaintiff stated that he suggested Plaintiff could be released out of the SHU and back to the compound if she would "help" and wanted Plaintiff to "wear a wire . . . to get more information from the officers involved." *Id.* Plaintiff states that she advised Defendant Williams she would help in any way she could, but then alleges that when it was discovered she "was not involved in any contraband, [she] was then totally disregarded and ignored." *Id.*, at 7-8.

Plaintiff alleges that Defendant Rivera, the warden, treated her "with contempt and disregard." *Id.*, at 8. Plaintiff alleges that Defendant Rivera knew some of the other female inmates who had been assaulted by the prison guards were put back on the compound to obtain more evidence against them. *Id.*

Plaintiff alleges that Defendant Horton, the Segregation Review Official (SRO), was just "as culpable as the warden and the SIS Lt. George Williams." *Id.*, at 8. Plaintiff contends that they "did not follow procedures set in place for Administrative Detention" and were deliberately indifferent and abused their discretion. *Id.*, at 8-9.

Plaintiff also alleges that Defendant Lappin, the Director of the Bureau of Prisons, "also demonstrated gross deliberate indifference, and abuse of discretion regarding the

overall circumstances." *Id.*, at 9. Plaintiff said that the Director "chose to disregard [her] plea for intervention and help." *Id.*

Plaintiff contends that after she was sexually abused, Defendants Lappin, Rivera, Horton, and Williams violated her due process rights, and "unjustly transferred" her away from FCI, Tallahassee, to Miami, and then to FCI, Dublin, California. Doc. 36, p. 11. Plaintiff raises a Thirteenth Amendment claim, alleges a retaliatory transfer, and claims Defendants were deliberately indifferent and discriminated against her "when she was not given the same opportunity to be a witness for being sexually abused by the prison guards . . . ." *Id.*, at 11-14.

**Basis for Defendants' motion for summary judgment, doc. 80**

Defendants Lappin, Rivera, Horton and Williams assert in the instant motion, doc. 80, that Plaintiff has failed to exhaust her administrative remedies. Doc. 80, p. 7. They contend that Plaintiff submitted the first two steps in the grievance process for challenging her redesignation to Miami, but did not appeal the denial of those to the Regional or Central Office after the Warden denied her request. Doc. 80, p. 7. Plaintiff also had a number of grievances rejected for failure to follow Administrative Remedy Procedures. *Id.*, at 8-9. Defendant Lappin argues that this Court does not have personal jurisdiction because he does not reside in Florida, nor "engaged in any act that would subject jim to personal jurisdiction under the statute." *Id.*, at 12-14. Defendant Lappin also contends Plaintiff failed to state a claim for deliberate indifference, that the doctrine of *respondeat superior* is not applicable in a <u>Bivens</u> action, and his conduct was reasonable. *Id.*, at 14-19.

Defendants Rivera, Horton, and Williams argue that Plaintiff fails to state a claim upon which relief may be granted. *Id.*, at 19-20. They assert that Plaintiff fails to allege a constitutional violation and fails to allege how Defendants were personally involved; they contend that they acted reasonably in response to Plaintiff's situation. *Id.*, at 20-23. Defendants point out that *respondeat superior* is unavailable as a theory of liability.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case. <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id.* An issue of fact is "material" if it could affect the outcome of the case. <u>Hickson Corp. v. Northern Crossarm Co., Inc.</u>, 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, <u>Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Hickson Corp.</u>, 357 F.3d at 1260, *quoting* <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986). All reasonable inferences must be resolved in the light most favorable to the nonmoving party, <u>Watkins v. Ford Motor Co.</u>, 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts. <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct. 1769,

167 L.Ed.2d 686 (2007), *cited in* <u>Ricci v. DeStefano</u>, 2009 WL 1835138, 18, — S.Ct. —, (June 29, 2009). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Industrial Co.</u>, 475 U.S. at 587 (internal quotation marks omitted), *quoted in* <u>Ricci v. DeStefano</u>, 2009 WL 1835138, 18, — S.Ct. — (June 29, 2009).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). <u>Owen v. Wille</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

Plaintiff may move for summary judgment, with or without supporting affidavits, upon all or any part of his or her claim. Fed. R. Civ. P. 56(a). Summary judgment shall be granted in favor of Plaintiff "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A claimant is entitled to summary judgment only when no genuine issue of material fact exists, the papers on the motion demonstrate the right to relief, and every one of the defenses asserted legally are insufficient." 10B CHARLES A. WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL PRACTICE AND

PROCEDURE § 2734 (1983). The motion should be denied if there is a fact issue as to any defense raised. *Id.* at 406; United States v. Carter, 906 F.2d 1375, 1377 (9th Cir. 1990) (citing * 2734). Since Plaintiff (as the party with the burden of proof) has a heavier burden on summary judgment, the Court will consider the Defendants' motion first and Plaintiff's motion for summary judgment will be considered in response to the Defendants' motion. If Defendants' motion is denied, the Court will consider whether Plaintiff is entitled to judgment as a matter of law.

**The relevant Rule 56(e) evidence**

**Defendant's evidence, doc. 80**

Special Agent Brunner, with the Office of Inspector General (hereafter "OIG"), was assigned to investigate allegations of staff misconduct in Tallahassee during the relevant time frame of this case. Defendants' Ex. B (doc. 80-9, p. 1).[5] Agent Brunner "received numerous complaints concerning sexual abuse of inmates by staff at the FCI." *Id.* These allegations came from the victims of the alleged abuse, as well as other inmate witnesses. *Id.*

The OIG works closely with Special Investigative Agents who are assigned to the Institution involved. Defendants' Ex. B (doc. 80-9, p. 1). Thus, Agent Brunner worked directly with Defendant Williams, the Special Investigative Agent at FCI Tallahassee, in conducting the investigation of sexual abuse. *Id.*, at 1-2. Pursuant to routine BOP policies, when credible allegations of sexual misconduct come to light, inmate victims of the alleged abuse are "immediately placed in the SHU [Special Housing Unit] for their

---

[5] The exhibits are referenced first as provided in the paper form and second, as filed and scanned on the electronic docket. Since Plaintiff will not have access to the electronic record, both citations are provided for reference.

safety and security during the investigative process." *Id.*, at 1, 2. During such an investigation, and pursuant to BOP policy, staff access is restricted to keep the inmate separated from staff involved in the allegations. *Id.*, at 1. In accordance with that policy, "[s]everal inmates believed to have been sexually abused by staff were immediately placed in the SHU . . . ." *Id.*, at 2. Some "inmates admitted to the abuse, others did not, and some inmates agreed to cooperated in the investigation by wearing concealed body recorders and recording certain staff members." *Id.*

Having obtained certain evidence, Agent Brunner spoke with Warden Rivera, providing "sufficient cause to transfer staff members from the FCI to the FDC, allowing certain inmates abused by staff to return to general population at the FCI." *Id.*, at 2. "Inmates were not returned to general population if there was not a reasonable assurance they would not be subjected to further abuse." *Id.* Such release was also conditioned on a "strong belief" that the inmate had "truthfully disclosed all sexual contact with staff and that the staff would not have access to the FCI in a custody assignment over the inmate." *Id.*

During this investigation, Agent Brunner learned from other inmates that Plaintiff allegedly had sexual contact with Defendant Dixon. Defendants' Ex. B (doc. 80-9, p. 2). Defendant Williams and Agent Brunner considered the allegation credible "based on the totality of the case," and placed Plaintiff in the SHU for her own protection. *Id.* The evidence "was insufficient to remove CO Dixon from the institution when the allegation was made." *Id.*, p. 3.

The order for Administrative Detention was signed by Lieutenant R.W. Johnson and received by Plaintiff on January 10, 2006. Attachment 7 (Doc. 80-8, p. 36). Agent

Brunner interviewed Plaintiff "on two occasions, without naming CO Dixon as the

suspected" Officer, but Plaintiff "denied the allegation that she had sexual contract with

any staff member."  Defendants' Ex. B (doc. 80-9, p. 3).  Sometime later, another

inmate housed in the SHU with Plaintiff told Agent Brunner that Plaintiff "would admit to

inappropriate contact with CO Spence in an attempt to be released from the SHU."  *Id.*

The inmate who reported that information, however, "said she could not determine the

truth of the matter from [Plaintiff]."  *Id.*  Agent Brunner interviewed Plaintiff again, but

Plaintiff "provided inconsistent statements about which staff she had sexual contact with

and admitted to lying in past interviews."  *Id.*  Because Agent Brunner could not

determine the full truth about Plaintiff's involvement with "staff members that were the

subject of this investigation," the Assistant United States Attorneys who were involved in

prosecuting the criminal case against staff (AUSA Robert Davis and Alan Sprowls)

decided "to not use [Plaintiff] as a witness."  Defendants' Ex. B (doc. 80-9, p. 3).

When it was determined there was sufficient evidence to bring criminal charges

against the officers involved in the sexual abuse of inmates, the Grand Jury issued an

indictment and agents went to FCI, Tallahassee attempting to arrest the six officers

charged.  Defendants' Ex. B (doc. 80-9, p. 2).  On the morning of June 21, 2006, efforts

to arrest indicted correctional officers ended in an exchange of gunfire, killing one of the

persons to be arrested, Correctional Officer Ralph Hill, and OIG Special Agent William

Sentner.  *Id.*

On July 1, 2006, Defendant Rivera transferred Plaintiff from FCI in Tallahassee

to the Federal Detention Center-Female, in Miami.  Attachment 8 (Doc. 80-8, p. 39).

The "return of service" shows the transfer was carried out on July 3, 2006.  *Id.*  The

reason stated on the transfer order was "increase population." *Id.* Warden Rivera

explained:

> Plaintiff and other inmates involved in the investigation were transferred
> along with inmates who were not involved in the investigation. In order to
> protect their identities, all inmates transferred at that time were noted as
> transfers for population increase.

Defendants' Ex. D (doc. 80-11, pp. 3-4).

Also participating in the investigation at FCI, Tallahassee, was Defendant

Williams, the Special Investigate Agent (SIA) at FCI. Defendants' Ex. C (doc. 80-10, p.

1). Defendant Williams submitted an affidavit specifically refuting Plaintiff's allegations

against him that he was inappropriate with her during the investigation, suggested she

would be released back to the compound if she helped him, and suggested she wear a

wire to get more information on the officers suspected of the abuse. *Id.* Defendant

Williams testifies in his affidavit that he "did not suggest that Plaintiff would be released

back on the compound if she helped" him. Defendants' Ex. C (doc. 80-10, p. 2).

Furthermore, he "did not suggest" that Plaintiff wear a wire. *Id.* Defendant Williams

states that he made it "very clear to Plaintiff that" his responsibility was to "ensure her

safety and keep her in a controlled environment." *Id.* Moreover, "[a]fter Plaintiff

changed her story and stated she had been abused by staff members she began asking

about how she could receive a sentence reduction." *Id.* Defendant Williams advised

Plaintiff that a sentence reduction was out of his control as they were "handled by the

United States Attorney's Office and [he has] no involvement in that process." *Id.*

Defendant Williams also disputes in his affidavit Plaintiff's allegations that she

was disregarded because she was not involved in any contraband. Defendants' Ex. C

(doc. 80-10, p. 2). Defendant Williams attests that when Plaintiff told him that she was willing to help the investigators, he "relayed that information to the investigators from the Office of the Inspector General (OIG), who were investigating her case at the time." *Id.* Defendant Williams states that he was not deliberately indifferent to Plaintiff's needs and did not abuse his discretion, but followed all procedures and policies of the BOP. *Id.* On January 10, 2006, Plaintiff was placed in the SHU in administrative detention pending investigation. *Id.*, *citing* Attachment 7. As required by policy, Plaintiff received a copy of the detention order. Defendants' Ex. C (doc. 80-10, p. 2). Plaintiff remained in administrative detention while the investigation was pending, and remained there "until her transfer to FDC Miami on July 3, 2006." Defendants' Ex. C (doc. 80-10, p. 3). Plaintiff was transferred upon an order from the Warden, Defendant Rivera, and Defendant Williams as the SIA, has "no authority to transfer inmates." Defendants' Ex. C (doc. 80-10, p. 3). Defendant Williams also has no authority "to recommend or grant a reduction in sentence" or to "recommend which inmates would be used as witnesses in the criminal case." *Id.* Those "are decisions made by the U.S. Attorney's office." *Id.*, at 4.

Defendant Mildred Rivera,[6] who was the Warden at FCI, Tallahassee, at the time of the events in question, also submitted an affidavit as evidence in support of the summary judgment motion. Defendants' Ex. D (doc. 80-11). Defendant Rivera denies having treated Plaintiff with contempt or disregard as alleged. Defendants' Ex. D (doc. 80-11, p. 1). Pursuant to Program Statement 5324.06, when an inmate alleges sexual

---

[6] Defendant Rivera is currently the Warden at the FCI in Estill, South Carolina, and left FCI, Tallahassee in December of 2006. Defendants' Ex. D (doc. 80-11, p. 1).

abuse by a staff member, the inmate is placed in the SHU, evaluated by medical staff, and an investigation is conducted. *Id.* When it was discovered that Plaintiff had possibly been involved in an inappropriate relationship with staff, she was placed in the SHU "to remove her from that situation and provide her with protection" while the investigation was conducted. *Id.*, at 2.

Defendant Rivera further denies not following procedures or abusing her discretion. *Id.*, at 2. She states that "all procedures and policies were followed." *Id.* Plaintiff was placed in the SHU pursuant to the procedures, and because the rules do not provide a time limit for placing an inmate in detention while an investigation is pending, "Plaintiff remained in SHU until her transfer to FDC Miami on July 3, 2006." *Id.*, at 2-3. Her transfer was in accordance with BOP policy and done, in part, due to "concern that potential witnesses would be approached on behalf of the staff members." *Id.* For her own safety, Plaintiff was transferred away from FCI Tallahassee. *Id.* "Plaintiff was transferred to FDC Miami because it is the only other secure female facility in Florida." *Id.* Plaintiff "remained there until she could be re-designated to another institution by the BOP's Designation and Sentence Computation Center (DSCC)." *Id.*, at 3.

Defendant Rivera also denies Plaintiff's allegations that she acted deliberately in trying to further incriminate the corrupt officers under investigation by placing the inmate victims back on the compound to obtain more evidence. Defendants' Ex. D (doc. 80-11, p. 3). Plaintiff herself was never placed back in general population. *Id.* Moreover, Defendant Rivera had "no involvement" in Plaintiff's transfer to FCI Dublin in California. *Id.*, at 4. When Plaintiff was no longer in Tallahassee, Defendant Rivera's involvement

ceased. The re-designation was completed by DSCC, in Beaumont, Texas, did not involve any Defendant in this case, and was based on "Plaintiff's custody classification and bed space availability." *Id.* Finally, Defendant Rivera reiterates that only the U.S. Attorney's Office had authority to grant a sentence reduction or decide who would testify in the criminal proceeding. *Id.*

Defendant Horton, a Captain at FCI Tallahassee at the time of the underlying events, held the position of Chief Correctional Supervisor. Defendants' Ex. E (doc. 80-12, p. 1). Defendant Horton denies being deliberately indifferent to Plaintiff, abusing his discretion, or not following procedures and policies. *Id.*, at 1-2. Defendant Horton "was not responsible for Plaintiff's placement in SHU" and was only involved in conducting segregation reviews. *Id.*, at 2. Defendant Horton "reviewed Plaintiff's placement in the Special Housing Unit within the first three days of her placement, and then conducted an in person interview with the Plaintiff on the seventh day." *Id.* Subsequent segregation reviews were conducted "[a]t each seven day interval following the first week," although these "were not in person reviews." *Id.* However, "at each 30-day interval, another in person review was conducted." *Id.*

Defendant Horton recalls "specifically asking Plaintiff many times what her issues and concerns were." Defendants' Ex. E (doc. 80-12, p. 2). Plaintiff claimed she did not "understand why she was in the SHU pending investigation when she claimed to have no knowledge or involvement with misconduct." *Id.* Defendant Horton had no information "regarding why Plaintiff was in the SHU other than that she was part of an on-going investigation." *Id.* Defendant Horton "had no knowledge of Plaintiff being abused or victimized by staff." *Id.*, at 2-3. "Plaintiff never expressed that information to

me, nor did [Defendant Horton] receive that information from any other source." *Id.*, at 3. Defendant Horton was not involved in the decision to transfer Plaintiff at any time, had not authority to recommend a sentence reduction, or determine who should be used as a witness. *Id.*

Defendants submitted the affidavit of Romulo Armendariz, who works for the BOP in the area of inmate classification and transfers, and who is the official who re-designated Plaintiff. Defendants' Ex. F (doc. 80-13, p. 1). The affidavit explains that Plaintiff's placement and transfer from FDC Miami to FCI Dublin was based on "her low security level classification and bed space availability at the time of redesignation." *Id.*, at 1-2. "Plaintiff's redesignation was reviewed and all security measures were taken utilizing Program Statement 5100.08." *Id.*, at 2; *see also* Attachment 19 (doc. 80-13, pp. 4-5).

Defendant Lappin, the Director of the Federal Bureau of Prisons, also submitted an affidavit. Defendants' Ex. G (doc. 80-14, p. 1). Defendant Lappin's office, which is in Washington, D.C., receives "hundreds of letters a week from inmates, inmate family members, Congressmen, and other interested individuals." *Id.*, at 1-2. Due to that volume, Defendant Lappin is "unable to personally review and respond to each letter, or to keep copies of the letters received." *Id.*, at 2. Letters are processed by designated staff who review them, and then forward to the appropriate department or division for a response. *Id.* "Inmate letters are often forwarded to the institution Warden for appropriate action." *Id.* If a letter's subject matter is sensitive or alleges misconduct, it "may be forwarded to a Regional Director, an Assistant Director, or the Office of Internal Affairs." *Id.* Defendant Lappin is unfamiliar with Plaintiff or the concerns that might

have been raised in an correspondence she alleges she sent to him. *Id.* Any such letter would have been handled by staff, not Defendant Lappin personally. *Id.*

**Evidence as to Exhaustion**

Bureau of Prisons regulations for filing administrative remedies provide that inmates first must "file a request for administrative remedy with the institution's Warden." Ex. A (Doc. 80-2, p. 2). "If dissatisfied with the response at the institutional level, the inmate may appeal the decision to the Regional Director and, thereafter, to the General Counsel's National Inmate Appeals Office." Ex. A (Doc. 80-2, p. 2). Prisoners must proceed "through all three levels of the Administrative Remedy Process to exhaust administrative remedies." *Id.* The first level requires filing a BP-9, the second level requires filing a BP-10, and the third level requires filing a BP-11. *Id.* Between June 9, 2006, and March 12, 2007, Plaintiff filed eight requests for administrative remedies, five of which were "rejected for failure to follow the administrative remedy procedure." Ex. A (Doc. 80-2, pp. 2-3).

On June 8, 2006, Plaintiff filed a Request for Regional Administrative Remedy, alleging her transfer from Tallahassee to Miami was retaliatory because she cooperated in the investigation. Ex. A (Doc. 80-2, p. 3); *see* attachment 11 (doc. 80-8, p. 46). That appeal was rejected on June 9, 2007, for failing to properly submit the required documents. Ex. A (Doc. 80-2, pp. 2-3); *see* attachment 11. On June 21, 2006, Plaintiff submitted another Regional Administrative Remedy Appeal about this transfer to Miami, which was rejected on July 3, 2006. Ex. A (Doc. 80-2, p. 3); *see* attachment 12 (doc. 80-8, pp. 48-51). Plaintiff wrote on the grievance that it was "sensitive" and that she was sending it directly to the Region level because Defendant Williams told her she "no

longer had any administrative remedy left available to her." *Id.*, at 48, 49.  Plaintiff did not want to be transferred away from FCI, Tallahassee and complained that she did not like way the investigation had been conducted.  *Id.*  She further alleged that she "was told what happened to me will not be used against the officers and it is worthless."  *Id.* She complained that she had "already given chronologically detailed statements to the investigators, yet what happened to me is being ignored and I am being transferred." *Id.*, at 50.  The response from the Regional Office advised that it was rejected for two reasons.  *Id.*, at 51.  First, it was rejected because the issue of being transferred was not deemed to be sensitive.  *Id.*  Second, it was rejected for failing to file at the Institutional level before filing an appeal.  *Id.*  Plaintiff was direct to "file a request of appeal at the appropriate level via regular procedures."  *Id.*

On October 2, 2006, Plaintiff submitted[7] a Request for Administrative Remedy, the first level of the grievance process, alleging she was redesignated to FDC Miami "without just cause" and claiming she "should not be in [an] FDC facility."  Ex. A (Doc. 80-2, p. 3); *see* attachment 13 (doc. 80-8, p. 53).  This is essentially the same grievance as those described above.  Plaintiff sought to be redesignated to another FCI facility. *Id.*  The Warden denied the request on November 2, 2006, informing Plaintiff that her placement met "established guidelines, while permitting [her] the opportunity to maintain close family ties with [her] immediate family who reside in Miami, Florida."  *Id.,* at 54. That response also indicated Plaintiff was housed in general population.  *Id.*  Plaintiff did not file an appeal concerning that request.  Ex. A (Doc. 80-2, p. 3).

---

[7] The grievance was received on October 17, 2006, and that is the date referenced in the response and by Defendants.  Attachment 13 *doc. 80-8, p. 54); Ex. A (doc. 80-2, p. 3).

On December 5, 2006, Plaintiff filed a Regional Administrative Remedy Appeal, requesting transfer to another FCI other than Miami. Ex. A (Doc. 80-2, p. 4); *see* attachment 14 (doc. 80-8, p. 56). That appeal was rejected for being untimely. Ex. A (Doc. 80-2, p. 4).

Plaintiff submitted another Regional Administrative Remedy Appeal, which she dated January 4, 2007, but which was received on January 11 2007, in which she sought "to be considered and approved for a sentence reduction to time served . . . ." Ex. A (Doc. 80-2, p. 4); *see* attachment 15 (doc. 80-8, pp. 58-60). She complained that her rights were being violated in "the way this entire ordeal has been conducted . . . ." *Id.,* at 58. She also complained about being transferred to Dublin, California, which she alleged was "deliberate indifference, as my family lives in Florida and Texas." Ex. A (Doc. 80-2, p. 4); *see* attachment 15 (doc. 80-8, 59). On February 1, 2007, the Regional Director responded and advised Plaintiff that her allegations of abuse by staff were under investigation. *Id.*, at 60. The response also informed Plaintiff that she was transferred due to safety concerns, but that she could "request a transfer through [her] Unit Team." *Id.* Further, the response clarified that the "Bureau of Prisons does not have the authority to reduce a court-imposed sentence," that she could not seek monetary compensation through the Administrative Remedy Program, and if she were dissatisfied with the response, she would have to appeal to "the Office of General Counsel within 30 calendar days of the date of this response." *Id.* On January 24, 2007, Plaintiff filed a Central Office Administrative Remedy Appeal, concerning her transfer to FCI Dublin, which was rejected on January 26, 2007, for being untimely. Ex. A (Doc. 80-2, p. 4); *see* attachment 16 (doc. 80-8, p. 62).

On March 6, 2007, Plaintiff submitted another Central Office Administrative

Remedy Appeal in which she sought monetary compensation for allegations of

constitutional violations.  Ex. A (Doc. 80-2, p. 4); *see* attachment 17 (doc. 80-8, p. 64).

On May 3, 2007, the National Inmate Appeals Administrator responded to the grievance

and informed Plaintiff her allegations of abuse were being investigated, and the

administrative remedy process was not the proper avenue to obtain monetary

compensation.  *Id.,* at 65.

The final grievance submitted by Plaintiff was on March 12, 2007, to the Central

Office.  Ex. A (Doc. 80-2, p. 4); *see* attachment 18 (doc. 80-8, p. 67).  Plaintiff's appeal

was rejected as untimely on March 13, 2007.  *Id.*

**Plaintiff's evidence, doc. 89**

In response to the Defendants' summary judgment motion, Plaintiff points to

previously submitted evidence (doc. 76), but Plaintiff did not submit exhibits with her

response.  Doc. 92.  Plaintiff also points to the arguments raised in her own motion for

summary judgment.  Doc. 92, *citing to* doc. 89.  Plaintiff did, however, provide evidence[8]

with her own motion for summary judgment, doc. 89, including her own affidavit.  Ex. A,

doc. 89 (doc. 89-2, pp. 3-5).[9]

---

[8] Evidence which duplicates Defendants' evidence has not been separately listed.

[9] Plaintiff's affidavit concerns her sexual abuse claims against Defendants Spence, Knight, and Dixon, and does not pertain to the allegations made against the four Defendants who filed the instant motion for summary judgment.  Doc. 80.

Plaintiff submitted an affidavit by inmate Cynthia Hinderliter, who stated that she and other women were transferred from FCI to Miami at 3:30 a.m. on July 4, 2006. Plaintiff's Ex. B (doc. 89-2, p. 7). She said that fifteen women were transferred, the same number of women included in the indictment. *Id.* "However, most of the women that were actually listed in the indictment and involved with the officers in various aspects, were allowed to remain at the institution, and were not even placed in the SHU for more than a few weeks." *Id.* "They were allowed to remain on the compound with the very officers that were abusing them in order to obtain more information against them." *Id.* Inmate Hinderliter states her belief that the transfer was "a cover up" and part of "damage control" after the shooting. *Id.* Similar testimony was presented in another affidavit[10] by Lori Mitchell. Plaintiff's Ex. B (doc. 89-2, p. 8).

Plaintiff submitted the letters she wrote to Defendant Lappin, the Director of the BOP. Plaintiff's Ex. C (doc. 89-2, pp. 10-17). Plaintiff requested his intervention and complained that she had not gotten a sentence reduction or been released as others had who were involved in the same investigation. *Id.*, at 10.

## Analysis

### Exhaustion of administrative remedies

When the Prison Litigation Reform Act was enacted, Congress mandated that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other

---

[10] Plaintiff presented other affidavits which concern the allegations of sexual abuse. Plaintiff's Ex. D (doc. 89-3). Those affidavits are not relevant to the claims at issue against Defendants Lappin, Rivera, Horton, and Williams, but also cannot be relied upon as evidence as they have been heavily redacted, including the name of the affiant. *See, e.g.* doc. 89-3, p. 4; *see also* Plaintiff's Ex. G (doc. 89-4).

correctional facility until such administrative remedies as are available are exhausted."

42 U.S.C. § 1997e(a), *quoted in* doc. 68, p. 2. The exhaustion requirement of §

1997e(a) is mandatory, whether the claim is brought pursuant to § 1983 or Bivens.

Alexander v. Hawk, 159 F.3d 1321, 1324-26 (11th Cir. 1998). There is no discretion to

waive this requirement or provide continuances of prisoner litigation in the event that a

claim has not been exhausted prior to filing. Alexander, 159 F.3d at 1325; *see also*

Porter v. Nussle, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (holding that "the

PLRA's exhaustion requirement applies to all inmate suits about prison life, whether

they involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong."); Brown v. Sikes, 212 F.3d 1205, 1207-08 (11th

Cir. 2000) (finding that an inmate must "provide with his grievance all relevant

information reasonably available to him" but he cannot be required to name individuals

responsible for challenged conduct when he could not yet identify those persons). The

Court may not consider the adequacy or futility of administrative remedies, but only the

availability of such. Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000), *citing*

Alexander, 159 F.3d at 1323. Even where an inmate seeks only monetary damages in

a civil rights case, he must complete the prison administrative process if it could provide

some sort of relief on the complaint although no money could be given administratively.

Booth v. Churner, 531 U.S. 956, 121 S. Ct. 1819, 1821, 149 L. Ed. 2d 958 (2001).

A prisoner must also comply with the process set forth and established by the

grievance procedures. *See* Miller v. Tanner, 196 F.3d 1190, 1193 (11th Cir. 1999). In

other words, not only must a prisoner exhaust a claim under § 1997e(a), the "PLRA

exhaustion requirement requires proper exhaustion." Woodford v. Ngo, 548 U.S. 81,

93, 126 S.Ct. 2378, 2387 (2006). Even if a grievance is initially denied as untimely, a prisoner must appeal the denial of the grievance. *See* Harper v. Jenkin, 179 F.3d 1311 (11th Cir. 1999)(noting Georgia's inmate grievance procedures allow "the grievance coordinator to waive the time period for filing a grievance if 'good cause' is shown"). If one claim is unexhausted, the Court may separate that claim out and proceed on only those claims that have been exhausted. Brown, 212 F.3d at 1206, n.1; Jones v. Bock, 549 U.S. 199, 223, 127 S.Ct. 910, 925 (2007) (rejecting a "total exhaustion rule" and requiring dismissal only of those unexhausted "claims," not an entire "action.").

Plaintiff is housed within the Bureau of Prisons [hereinafter "B.O.P."], which has an administrative grievance program. *See* 28 C.F.R. § 542.10 (2009). The B.O.P. regulations provide that an inmate "shall first present an issue of concern informally to staff . . . ." 28 C.F.R. § 542.13(a). A discretionary exception permits an inmate to bypass the information resolution attempt "when the inmate demonstrates an acceptable reason for bypassing informal resolution." 28 C.F.R. § 542.13(b). Exceptions are for "sensitive issues," when the inmate "reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution . . . ." 28 C.F.R. § 542.14(d)(1). Pursuant to the regulations, an inmate must file a grievance within "20 calendar days following the date on which the basis for the request occurred." 28 C.F.R. 542.14(a). An extension in filing may be allowed if the "inmates demonstrates a valid reason[11] for delay." 28 C.F.R.

---

[11] "Valid reasons for delay include the following: an extended period in-transit during which the inmate was separated from documents needed to prepare the Request or Appeal; an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal; an unusually long period taken for informal resolution attempts; indication by an inmate, verified by staff, that a response to the inmate's

§ 542.14(b).  In such a case, the inmate could submit a request or grievance directly to the appropriate Regional Director.  28 C.F.R. § 542.14(d)(1).

Plaintiff complained in her grievances of the sexual abuse, of being transferred, of wanting a reduction in her sentence, but she did not exhaust administrative remedies as to her argument that she should have been released sooner from confinement in the SHU.  That claim was not exhausted through the grievance process.

### Claims against Defendant Lappin

Defendant Lappin asserts a lack of personal jurisdiction.  Doc. 80, p. 12.  This Defendant also argues Plaintiff has failed to state a claim, *Id.*, at 14, and that *respondeat superior* is not a basis for liability in a <u>Bivens</u> action.  *Id.*, at 16.

Even if personal jurisdiction exists, and that issue need not be resolved here, the motion for summary judgment should be granted as to Defendant Lappin.  Defendant Lappin is Director of the Bureau of Prisons.  He is not personally responsible in a <u>Bivens</u> suit for the actions or inactions of his subordinates.[12]  Plaintiff simply sent letters to Director Lappin complaining about her transfer, requesting a reduction of sentence, and expressing her feelings that she had been generally treated unfairly during the

---

request for copies of dispositions requested under § 542.19 of this part was delayed."
28 C.F.R. § 542.10(b).

[12] A prison official cannot be named as a Defendant in a civil rights case merely because he or she has supervisory authority over others.  The doctrine of *respondeat superior* does not provide a basis for recovery under § l983, or in a <u>Bivens</u> action. <u>Correctional Services Corp. v. Malesko</u>, 534 U.S. 61, 70-71, 122 S.Ct. 515, 521, 151 L.Ed.2d 456 (2001); <u>Dalrymple v. Reno</u>, 334 F.3d 991, 995 (11th Cir. 2003); <u>Harvey v. Harvey</u>, 949 F.2d 1127, 1129 (11th Cir. 1992), *citing* <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  A supervisor may only be liable if the supervisor personally participated in the alleged constitutional violation, or when there is a causal connection between the supervising official and the alleged violation.

investigation. Plaintiff's Ex. C (doc. 89-2, pp. 10-17). Due to the volume of correspondence from prisoners and others, Defendant Lappin is unable personally to review letters from prisoners. Doc. 80, Ex. G (doc. 80-14, p. 2). He has no authority to cause the reduction of a sentence under the circumstances here. There is no evidence that Defendant Lappin was personally involved in Plaintiff's sexual abuse, the investigation into that abuse, and the decisions to place her into the SHU for her safety, to not use her as a witness in the investigation or prosecution, and to transfer her. Summary judgment should be granted in favor of Defendant Lappin.

**Claims against Defendant Rivera**

Plaintiff's claims against Defendant Rivera fail for the same reason. Defendant Rivera was Warden of FCI, Tallahassee. She is not liable in a case of this sort for the actions of other persons. Defendant Rivera's only personal involvement was to sign the order transferring Plaintiff and other prisoners to FCI Miami. That violated no constitutional rights. Prisoners have no constitutional right to remain in, or be transferred to, a particular institution with particular rules, regulations and privileges. Meachum v. Fano, 427 U.S. 215, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976); Montayne v. Haymes, 427 U.S. 236, 96 S. Ct. 2543, 49 L. Ed. 2d 466 (1976). Both Meachum and Montayne held that intrastate prison transfers do not implicate due process rights.

There is no evidence that Defendant Rivera had anything to do with the transfer of Plaintiff to FCI Dublin, and the claim fails for that reason. Even if she had ordered that transfer, an interstate transfer of a prisoner does not implicate a due process right. Olim v. Wakinekona, 461 U.S. 238, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983).

Likewise, even if Defendant Rivera had been involved in the transfer to the special housing unit, and even if administrative remedies had been exhausted as to that claim, that assignment did not violate due process either. The Due Process Clause does not directly protect an inmate from changes in the conditions of his or her confinement, *see* <u>Meachum</u>, as long as the condition to which the prisoner is subjected does not violate the Constitution and is not outside the sentence imposed. <u>Montayne</u>, at 242, 96 S. Ct. at 2547. <u>Sandin v. Conner</u>, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995), reaffirmed the holdings of <u>Meachum</u> and <u>Montayne</u> and reiterated again that "the Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner." <u>Meachum</u>, at 224, 96 S. Ct. at 2538, *cited in* <u>Sandin</u>, 515 U.S. at 478, 115 S. Ct. at 2297. The Due Process Clause protects interests "generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Sandin</u>, at 484, 96 S. Ct. at 2300. Changes in custody, classification levels, or even certain privileges are not atypical. Consequently, Defendant Rivera is entitled to summary judgment as to Plaintiff's claims concerning administrative detention in the SHU, transfer to Miami, and transfer to California.

**Claims against Defendant Horton**

Since Plaintiff did not exhaust administrative remedies concerning her detention in the SHU, there are no claims that can proceed against Defendant Horton.

Further, Plaintiff has not come forward with evidence to show that Defendant Horton violated any of her constitutional rights. Defendant Horton's only involvement was in conducting segregation reviews. Defendant Horton was not involved in the

investigation.  Indeed, he was not even aware of the reason that Plaintiff was "in the SHU other than that she was part of an on-going investigation."  Because Defendant Horton played no role in the investigation or in the decision to transfer Plaintiff, summary judgment should be granted in his favor.

### Claims against Defendant Williams

Defendant Williams was only involved in the criminal investigation.  It does not appear that Plaintiff exhausted administrative remedies as to Williams because she did not specifically grieve the manner in which Defendant Williams conducted that investigation.  A grievance that complains in general terms about "the way this entire ordeal has been conducted" is not sufficient to put prison officials on notice of a claim against Williams.  Although Plaintiff did complain about the investigation in one "sensitive" grievance which was submitted directly at the Regional level, that grievance was rejected as not being "sensitive."  Plaintiff did not properly exhaust remedies as to any claim against Williams.

Moreover, even if Plaintiff had exhausted this claim, Defendant Williams is entitled to summary judgment in his favor.  Plaintiff does not have a constitutionally protected interest in the manner in which an investigation into the criminal conduct of others is conducted.  Furthermore, this investigation, insofar as it relates to Plaintiff, was plainly reasonable.  Law enforcement officials at FCI promptly sought to protect Plaintiff when it came to light that she might have been sexually abused by officers.  She was placed into the SHU.  This was a reasonable way to protect Plaintiff from staff during an investigation into those allegations.  Perhaps Plaintiff had a chance to reduce her sentence by providing substantial assistance to the Government in the investigation of

the criminal conduct of others, but Plaintiff lost the opportunity by her initial untruthfulness. As a direct consequence, the investigator and prosecuting attorneys decided she was not sufficiently credible and she was not used during the prosecution. Plaintiff was kept safely confined in the SHU and there is no evidence that Plaintiff was put "in harms way" by requiring her to return to the compound with a "body bug," to record conversations.[13] She has no claim about the transfers to Miami and to Dublin FCI for the reasons discussed above, and there is no evidence that Williams was involved in those decisions. Summary judgment should be granted in favor of Defendant Williams.

**Recommendation**

Accordingly, it is **RECOMMENDED** that the motion for summary judgment, doc. 80, filed by Defendants Williams, Rivera, Horton, and Lappin be **GRANTED,** that the motion for summary judgment filed by Plaintiff, doc. 89, be **DENIED**, and this case be **REMANDED** for further proceedings on the surviving claims against Defendants Knight, Dixon, and Spence.

**IN CHAMBERS** at Tallahassee, Florida, on July 20, 2009.

**s/ William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[13] Plaintiff lacks standing to complain about how other prisoners might have been treated.

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.