**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE, FLORIDA**

| | |
|---|---|
| *MYRA C. SOLLIDAY,* | ) |
| | ) |
| *Plaintiff,* | ) *Case No:* |
| | ) *4:07-cv-363-RH/WCS* |
| *vs.* | ) |
| *E. LAVON SPENCE,* | ) *Tallahassee, Florida* |
| | ) *April 7, 2010* |
| *Defendant.* | ) |
| _____ | ) |

**TESTIMONY OF JENNIFER DRITT**
**(Pages 1 through 38)**

**TRANSCRIPT OF ** EXCERPT ** OF TRIAL**
**BEFORE THE HONORABLE ROBERT L. HINKLE,**
**UNITED STATES DISTRICT JUDGE, and a jury**

APPEARANCES:

For the Plaintiff,      The Frank Law Firm
Myra C. Solliday:       By:  DAVID M. FRANK
                             Attorney at Law
                             dfrankservice@gmail.com
                        1648 Metropolitan Circle
                        Suite A
                        Tallahassee, Florida    32308



***JUDY A. GAGNON, RMR, FCRR***
*Official United States Court Reporter*
*111 North Adams Street * Tallahassee, Florida  32301-7717*
*(850) 561-6822*

*Jennifer Dritt - Direct*

1                    *   *   *   *   *   *   *   *

2            MR. FRANK:  Okay.  Plaintiff calls Ms. Jennifer

3   Dritt.

4            DEPUTY CLERK:  Please raise your right hand.

5        **JENNIFER LYNN DRITT, PLAINTIFF'S WITNESS, DULY SWORN**

6            DEPUTY CLERK:  Be seated.

7            Please, state your full name and spell your last

8   name for the record.

9            THE WITNESS:  My name is Jennifer Lynn Dritt,

10   D-r-i-t-t.

11                         DIRECT EXAMINATION

12   BY MR. FRANK:

13   Q.  Okay.  Ms. Dritt, would you please tell the jury, where

14   do you work?

15   A.  I work at the Florida Council Against Sexual Violence

16   here in Tallahassee.  It is the statewide coalition of rape

17   crisis program.  I'm executive director.

18   Q.  And would you tell us a little bit about that work?

19   A.  Certainly.  The Florida Council Against Sexual Violence

20   is a federally-recognized state sexual assault coalition.

21   Every state has got one.  And our responsibility is to do a

22   number of things.  One is to provide support to our

23   legislators and other public officials on good public policy

24   affecting victims of sexual violence across the lifespan of

25   childhood through late adulthood; to provide technical

*Jennifer Dritt - Direct*

1   assistance and training to Florida direct crisis programs on

2   best practices and provide service to the victims of sexual

3   assault; to support allied professionals -- by that I mean

4   law enforcement agencies and medical professionals -- in

5   doing the best job possible when they respond to the victims

6   of sexual assault.  I also do consultation on criminal issues

7   around provision of services for sexual assault victims and

8   really advocate for victim centers' response at both the

9   state and local level.

10  Q.  Okay.

11          MR. FRANK:  May I approach, Your Honor?

12          THE COURT:  You may.

13  BY MR. FRANK:

14  Q.  Ms. Dritt, I'm going to hand you what's been marked and

15  admitted as Plaintiff's Exhibit 6 and ask if you recognize

16  that.  Do you know what that is?

17  A.  I do.  That's my curriculum vitae.  That's my resumé.

18  Q.  That's your resumé?

19  A.  Yes, sir.

20  Q.  Okay.  Thank you.

21      Can you tell the jury some of the work you did as a

22  therapist, as a mental health counselor?

23  A.  Certainly.  I have a Master's degree in clinical social

24  work from a clinical social work program; and in my capacity

25  as a clinical social worker, both during my Master's

*Jennifer Dritt - Direct*

1  education and postgraduate, I have worked with children,

2  adolescents, and adults who have been sexually abused and

3  sexually assaulted as well as in both inpatient settings and

4  outpatient settings; in addition to children, adolescents,

5  and adults who are not survivors of sexual assault or sexual

6  abuse but have primarily mood disorders, either depression or

7  anxiety disorders.

8      I've worked in inpatient settings and psychiatric

9  emergency room settings and in outpatient settings, and I

10  have provided thousands of hours of clinical work to adult

11  and adolescent survivors, and child survivors of sexual

12  assault and child sexual abuse.

13      I've also taken -- I've also taken my share of hotline

14  calls in rape crisis settings doing direct clinical work and

15  in joint group and to provide to other clinicians; and I have

16  met many victims at the hospital when rape crisis centers

17  called that they have a survivor and gone to the hospital for

18  a forensic exam.

19  Q.  Okay.  I think you had mentioned to me that the resumé I

20  just handed you was written up with the -- to orient it

21  towards management responsibilities; is that correct?

22  A.  Yes, sir.

23  Q.  I really want to talk more and really want you to

24  describe a little more about the -- more the clinical work

25  that you've done, because that's more relevant today.

1       Have you had any extended clinical internships?

2  A.   I have.   I did an eight-month long and full time -- by

3  that I mean, 35 hours a week -- placement in an unpaid

4  internship, where I worked in an outpatient community mental

5  health center based in East Boston, which was an economically

6  depressed and psychologically depressed area of Boston,

7  working with both adults, adolescents, and children in a

8  clinical setting 35 hours a week, and providing consultation

9  to local elementary schools who were having difficulties with

10  kids who were seen in therapy.

11      I've done an eight-month long, 35-hour week placement at

12  the University of Colorado, Health Science Center, in adult

13  outpatient, adolescent inpatient, and psychiatric ER setting,

14  provided assessment and intervention to individual and group

15  therapy, and dealing with psychiatric emergencies.   So people

16  who walked into the psych ER or were by law enforcement

17  because they were having psychotic breakdowns in the street,

18  which we assess them and then made decisions about whether

19  they needed to be Baker Acted.   So those were just my

20  training.

21  Q.   And you did some work at Charter Hospital in Albuquerque,

22  New Mexico?

23  A.   I did.   I was the psychiatric social worker on the

24  adolescent unit, responsible for group psychotherapy and

25  individual therapy with adolescents.

*Jennifer Dritt - Direct*

6

1   Q.   Okay.   And you did some work at the Children and Family

2   Services, Inc.?

3   A.   It's an outpatient not-for-profit mental health center,

4   community-based mental health center.   I worked there full

5   time for three and a half to four years doing probably the

6   standard -- clinical standard is 20 to 25 hours a week of

7   therapy.   So with adolescents and adults and children

8   about -- in any outpatient mental health setting about 30 to

9   50 percent of them were presenting with anxiety or

10  depression, had been sexually abused as children or raped as

11  adults.   So the initial -- for them, it's probably not

12  necessarily sexual assault or sexual abuse but a mood

13  disorder.   When you do an assessment, you'll find that the --

14  what you're seeing them going through is a consequence of

15  their assault.

16  Q.   Okay.   And did you have an opportunity to make a

17  presentation entitled, "The Role of the Victim Advocate in

18  Responding to Sexual Assault"?

19  A.   Yes.   It's one of the presentations that I have done

20  recently and fairly consistently in helping communities

21  address a competent response to survivors.

22  Q.   And did you made a presentation called, "The Response of

23  Victims to Sexual Assault:   The Psychology Response Team

24  Training"?

25  A.   Yes.   That's one of the trainings that I've done across

*Jennifer Dritt - Direct*

1   the state.

2   Q.  Can you estimate, just a rough estimate, about how many

3   hours you would have worked with adult victims of rape?

4   Would it be 20, 30, hundreds?  How many hours do you think --

5   A.  How many hours of clinical work that I have done?

6   Q.  How many hours of clinical work do you think you have

7   spent over your lifetime with adult victims of rape or sexual

8   assault?

9   A.  My guess is probably 4- to 5,000 hours.

10  Q.  How much?

11  A.  Four- to 5,000 hours.

12  Q.  Four- to 5,000 hours?

13  A.  I've been doing this for 30 years, since I was 21.  So 4-

14  to 5,000 hours.

15  Q.  As part of that experience, have you made assessments of

16  victims of rape and sexual assault?

17  A.  Yes, sir.

18  Q.  As part of that experience, have you recommended

19  treatment for victims of rape and sexual assault?

20  A.  Yes, sir.

21  Q.  Are you familiar with the modalities available to treat

22  adult victims of rape and sexual assault?

23  A.  Yes, sir, I am.

24  Q.  And are you familiar with the present cost of that kind

25  of care and treatment?

*Jennifer Dritt - Direct*

8

1   A.   Yes, sir.

2   Q.   Okay.  Did you also have an experience and do some work

3   with the Sexual Violence, Applied Research Advisory Group?

4   A.   Yes, sir.  I was a member of that for three years.

5   Q.   And is there a publication you worked on of "The Current

6   Trends in Psychological Assessment and Treatment Approaches

7   for Survivors of Sexual Trauma"?

8   A.   Yes, sir.  If I can explain, the Sexual Violence, Applied

9   Research Advisory Group was a group of individuals from

10  various disciplines across the country -- not a very large

11  group, seven to ten members -- who were responsible for doing

12  peer review on documents, articles published as part of

13  *violenceagainstwomen.net*, which is an online resource of

14  largely professional publications on either intervention- or

15  prevention-related issues having to do with sexual assault,

16  and I was one of the members of group.  We didn't do the

17  research, but we were responsible for recommending a series

18  of research that were often funded by federal grants, and

19  then reviewing the publications that came out of that

20  research, yes.

21  Q.   And I notice, in regard to that work, you have said that

22  it was with an emphasis on early intervention.

23  A.   Yes.

24  Q.   And you don't have to talk about it now, because I know

25  we will talk about it in just a few minutes, but I take it

*Jennifer Dritt - Direct*

9

```
 1  early intervention is important.
 2  A.  Yes.  When you're dealing with survivors of sexual
 3  assault, earlier the intervention, in terms of getting them
 4  the support, the better the outcome.
 5  Q.  What have you been asked to do in this case, Ms. Dritt?
 6  A.  I have been asked to do a brief assessment of
 7  Ms. Solliday, look at the documentation from the correctional
 8  system and make an assessment about essentially what -- of
 9  the impact of the sexual assault on her, what I would think
10  would be the best response going forward, and roughly
11  estimate what I think the treatment intervention will look
12  like and the cost of that.
13  Q.  Did you review any materials?
14  A.  I did.  I reviewed a number of materials.
15  Q.  Did you review the medical records?
16  A.  I did, yes.
17  Q.  Psychological assessments?
18  A.  Yes, sir.
19  Q.  Various correspondence?
20  A.  Yes, sir.
21  Q.  The complaint in this case?
22  A.  Yes, I read that.
23  Q.  And photographs of Ms. Solliday, which I believe are at
24  your witness stand?
25  A.  Yes, sir.
```

*Jennifer Dritt - Direct*

1    Q.   Okay.  Did you do an in-person assessment of

2    Ms. Solliday?

3    A.   I did, yes.

4    Q.   And when did do that?

5    A.   Monday, the 5th.

6    Q.   Two days ago?

7    A.   Two days ago.

8    Q.   Did you have a chance to spend enough time with her to do

9    a -- to understand her profile?

10   A.   Yes.

11   Q.   Okay.  Before we discuss your findings about

12   Ms. Solliday, in particular, I would like to ask you, because

13   this is extremely important, I want to ask you, in general,

14   what effect sexual assault can have on a victim.  And

15   assuming that there is no lasting physical injury, how bad

16   can it be?  By that I mean, how can a person be affected by a

17   sexual assault, psychologically, emotionally, just in general

18   terms?  Is it something that just goes away in a few days or

19   is it something significant?

20   A.   No.  It's something significant.  I've spent a lot of

21   time over the last 30 years with survivors, both non-stranger

22   assaults and stranger assaults.  It's a very common response

23   for a survivor to say, "Okay.  Well, I'm just going to put

24   this behind me and go forward."  But I have never met a

25   survivor who has ever been able to do that, because it's a

1    profoundly damaging, I would say wounding, event that goes to

2    the core of who a person is and her or his self worth.  It

3    has lasting effects, and those lasting effects are well

4    documented in the research.

5        You know, some people suffer from anxiety and depression.

6    Some people more depression than anxiety.  The longstanding

7    consequence of sexual assault are well documented and have

8    been for the last 15 or 20 years.

9    Q.  Okay.  Now let me ask you about a particular kind of

10   sexual assault:  Custodial sexual assault.

11       Would you please take a few minutes and explain your

12   understanding, what you've gain through your experience and

13   training, and what you know about custodial sexual assault or

14   rape?

15   A.  I would like to talk a little bit about, first, if I may,

16   about the difference between stranger sexual assault and

17   sexual assault committed by someone that the victim or

18   survivor knows.  And by that, when I'm talking about

19   acquaintance sexual assault, I'm not talking about intimate

20   partners sexual assault, because most sexual assaults are not

21   committed by a partner.  It's committed by somebody that

22   somebody knows but not necessarily an intimate partner.

23       So imagine a stranger of sexual assault, you don't know

24   the offender, you might know the offender later; and I am

25   asking you really to imagine yourself as someone who

*Jennifer Britt - Direct*

1   either -- who is -- finds themselves actually assaulted in a

2   situation when you are attacked by a stranger.  The sense

3   that one has of -- it's not all that -- survivors of stranger

4   sexual assault are less likely to ask themselves, what could

5   they have done differently, because they hadn't invested any

6   trust in this person, they didn't know who this person was.

7   They weren't necessarily feeling that they had a relationship

8   with someone, and it's very easy when one is assaulted by a

9   stranger to see it as a crime that is not personal.  I mean,

10  it has a personal manifestation in that one is violated

11  physically, but it's not personal.  So it doesn't necessarily

12  go to your sense of yourself as a valuable human being in

13  quite the same way.

14      Now, people who are assaulted by acquaintances typically

15  have longstanding problems post-assault with issues around

16  trust and their own judgment.  So, though, the assault isn't

17  her fault or his fault -- because men are raped -- victims

18  always -- in fact, I've never met a victim of acquaintance

19  sexual assault who didn't ask herself why she didn't see this

20  coming, even in a situation, if you look at the evidence,

21  where it's clearly set up by the offender, and in most cases

22  they are.

23      Now, what Ms. Solliday experienced is even greater.  Sort

24  of imagine those questions are magnified and the helplessness

25  of that situation is magnified.  You know, we send our

1  children to school every day, and we trust them to be taken

2  care of by the people at school.  And they are told by us to

3  trust people in authority and do what they are told.

4      Ms. Solliday was in a -- is not a child but is an adult

5  in a custodial situation in which, you know, prison is not --

6  in which really the aspect -- every aspect of her day from

7  waking to bathing to recreation to working to going to sleep

8  to eating is governed by someone else, is determined by an

9  external force.  And if it's hard to imagine yourself in that

10  situation, imagine yourself being hospitalized for a physical

11  injury or because perhaps you've got some heart trouble, so

12  you're connected to wires and tubes, and you may be sort of a

13  vigorous human being, anyway, but a nurse comes in, you're in

14  the bed, and fondles you or touches you.  You can't leave

15  necessarily without going against medical advice, in which

16  case your insurance won't pay for your care.  You have an

17  expectation of being cared for in that setting, and your

18  expectation is completely violated.

19      So, while it might be hard to imagine yourself in

20  Ms. Solliday's shoes, we can easily, as adults, find

21  ourselves in situations in which we are in the care of other

22  people or the custody of other people, even for a brief

23  period of time.  We have a right to expect that we will be

24  taken care of in those situations.  But you aren't by nature

25  in that situation as a patient less than, and anyone would

1  say that you -- you might not -- once you had left, you might

2  be able to go without fear and report back to someone at the

3  hospital, which is not the situation that someone, an adult,

4  actually in the physical custody of another human being or

5  other organizations have, that she's never going to leave

6  that hospital, you know, by that I mean, not tomorrow, not

7  the next day, not going to be discharged tomorrow, wakes up

8  and has to face that same offender day in and day out.

9  Q.  And is it your opinion that the effect of a custodial

10  rape that it can be more profound on a victim than a

11  noncustodial rape?

12  A.  Yes, absolutely.  Because there is no immediate capacity

13  to escape, no sense that necessarily that justice can be

14  achieved.  There is no way to get away from the threat, and

15  the threat is ongoing.

16  Q.  You mentioned this school teacher-student situation for a

17  custody situation.  You mentioned a hospital patient

18  immobile.  Would a boss and an employee be another, albeit

19  lesser, but another situation of that relationship of custody

20  or power?

21  A.  Sure, power.  It substantially affects the capacity of

22  the person in a position of lesser authority to function

23  appropriately or well or safely in that environment, because

24  the person who sexually assaulted you also controls your

25  employment, which in a very real way affects your livelihood

1   and whether you can eat or cloth your children or be safe.

2   Q.  And we can see Ms. Solliday is a fairly mid to small

3   sized women.  Would it also be the fact that these guards

4   were males and most likely larger in physical size, does that

5   come into play?

6   A.  It certainly does.  I mean, I think that even, as I

7   explained, even in a situation where the -- if you weren't

8   looking at the custodial situation, it's very easy --

9   relatively easy for a person of, say, a man of my own size to

10  assault me, because my brothers who, for example, are very

11  small men, are still significantly stronger than I am.  So,

12  just the -- and also the --

13  Q.  Let me pause you for a second.

14      MR. FRANK:  Your Honor, if it would be okay, we

15  probably are halfway through, could I ask Ms. Solliday to step

16  outside.  Would that be okay?  I would prefer her not hearing

17  this.

18      THE COURT:  That's all right, yes.

19      MR. FRANK:  Thank you, Your Honor.

20      (*Ms. Solliday exited the courtroom.*)

21  BY MR. FRANK:

22  Q.  Okay.  We've talked about sexual assault, rape on an

23  adult, and you've talked about the added dimension of it

24  being a custodial, a custodial rape.

25      In that hierarchy of some of the examples you gave, how

*Jennifer Dritt - Direct*

16

1    severe is the prisoner-guard relationship?  Does it get any

2    worse?

3    A.  No, I don't think it does.  I mean, I think, you know, we

4    have an expectation that prison is about punishment and

5    people making not necessarily restitution, but paying for

6    their crime.  But rape is not part of the sentence, and there

7    isn't a more -- there isn't a -- I really can't think of one

8    in the moment a more severe custodial relationship than that

9    of guard to inmate.

10   Q.  Okay.  And you mentioned the stranger rape or assault

11   versus rape or assault from somebody that is known.

12   A.  Yes, sir.

13   Q.  Do people who are assaulted by someone they know, do they

14   tend to relive the event more than those affected by

15   strangers?

16   A.  Well, not necessarily.  What they do experience, as I

17   said, is -- most -- most victims of sexual assault will

18   experience some aspects of posttraumatic stress disorder,

19   which includes a reliving of the crime at some point in their

20   lives.  I think the fact that Ms. Solliday was not able to

21   get away from -- was not able to leave the scene of the crime

22   ever and was in a circumstance 24 hours a day in which one

23   thing after another would have reminded her of the

24   circumstance about the crime.  She would have been triggered

25   to relive those aspects, violent aspects of the crime every

 1  day.

 2  Q.  Okay.  And in your view that would have magnified the

 3  psychological harm to her?

 4  A.  Yes, sir.

 5  Q.  Okay.  I want you to tell now, if you would, please, just

 6  tell the jury a little bit about your assessment of

 7  Ms. Solliday, what you learned when you reviewed the records

 8  and you had your in-person interview with her.  Please tell

 9  the jury what you learned and what your assessment is.

10  A.  I think I -- I wanted to tell -- I would like to tell

11  you, what I was really struck by in meeting with Ms. Solliday

12  is how remarkable it was that a person with her degree of

13  education had really achieved what she achieved in prison.

14  As I think as a society, we think as prison as a place where

15  we really want in a perfect world people to rehabilitate

16  themselves.  We want a prison to provide that opportunity for

17  them.  And this is a woman who made use of every opportunity

18  that was offered her, to get her GED, prepare herself for

19  life outside of prison, maintain her relationships in a very

20  active way with her family, which is very grounding and very

21  important.  I mean, a prisoner doesn't fail to be a human

22  being.  In other circumstances we might be talking about

23  Ms. Solliday as a person who really, you know, made

24  absolutely the best of a very bad situation and the best out

25  of a situation which she was suffering for a decision she had

*Jennifer Britt - Direct*

1   made earlier.  But what I was really struck with was that.

2       So we had offered her as a society an opportunity to do

3   something different and basically pay for her crime and also

4   make good use of the time and make something of herself, and

5   she did that.  So prison actually offered progression.

6       What happened to her was a very serious regression, so

7   that everything that she had worked hard to achieve was taken

8   away from her as a consequence of the assault, which was not

9   her fault.  She was not asked to be sexually assaulted by a

10  guard with a fair amount of authority who she trusted to take

11  care of her, and that's a reasonable expectation.  We should

12  be able to trust, in that situation, the guards to take care

13  of us, not abuse us.

14      So what I was struck with was how hard she worked, how

15  much she had done for herself in that setting, and how much

16  had been taken from her so that she is no longer able to work

17  in the same setting where she had actually a substantial

18  amount of responsibilities doing payroll and purchasing for

19  FCI.  Not there anymore.  Doesn't have access to the same

20  educational system that she had.  And because she's

21  relocated, through no fault of her own, to another

22  correctional facility, she is not on the travel route that

23  her family takes from one part of this country to another

24  part of this country, so she doesn't have regular access to

25  her family.

```
 1        So not only was she sexually assaulted, but she was then

 2   punished for telling the truth about it, when she thought it

 3   was safe to do that.  And I'm really struck by some of the

 4   injustice about it.  She did actually what we want prisoners

 5   to do.

 6   Q.  Let me ask you this:

 7        You spent an hour or two -- it was more than an hour with

 8   her, correct?

 9   A.  Yes.

10   Q.  You got a feel for her as a person.  Yes?

11   A.  Yes, sir.

12   Q.  Okay.  Look at those pictures that are in front of you.

13   Those are -- I believe they are Exhibit Number 2 in the case.

14   I want you to just look at those, and tell the jury what your

15   impression is of her demeanor and affect, her presentation in

16   those photographs, which we all know now from previous

17   testimony were taken before the rape.  Tell the jury what

18   your assessment is of her affect and demeanor and personality

19   now compared to before the rape.

20   A.  Well, I think it's important to say that really it's not

21   as if these are dynamic presentations so I don't have some --

22   I'm not actually observing them, but what I notice is a

23   person who seems very pleased to be in the company of her

24   family, not ashamed to have a picture taken with them and

25   who's clearly deeply attached, you know, very proud to see
```

*Jennifer Dritt - Direct*

1    her children and proud to see her grandchildren, and she

2    looks peaceful.  And that might seem odd, but in a situation

3    that must have seemed stable to her.

4        What I know now is that spending an hour and a half, two

5    hours with her, I'm aware of how labile she is.  By that I

6    mean, how quickly she comes to tears, how anxious she is and

7    unable to know when she will next feel -- having anxiety

8    attacks.  By that I mean, she is -- an example is, having

9    been given a job in the correctional facility, which requires

10   her to be alone in another part of the correctional facility

11   with an officer, which prior to the assault would not have

12   been a problem for her, but it created such anxiety for her

13   that she was unable to maintain that job.  She could work,

14   but not in a job that required her to be alone in another

15   part of the facility, not observed, in the presence of a

16   correctional officer.

17   Q.  Okay.  I think we've covered -- is it fair to say we've

18   covered sort of your general impression of her?

19   A.  Yes, sir.

20   Q.  We've covered the basics of custodial rape; we've covered

21   your general impressions of Ms. Solliday --

22   A.  Yes, sir.

23   Q.  -- sufficiently?  Because I want to --

24            MR. FRANK:  May I approach, Your Honor?

25            THE COURT:  You may.

1    BY MR. FRANK:

2    Q.   I want to show you again the exhibit with the

3    psychological assessments.   This is Exhibit 4.

4        This stack of paper is the psychological assessments and

5    medical write-ups.   You have reviewed those, correct?

6    A.   Yes, sir.

7    Q.   Okay.   Would you tell the jury now, first, I want you to

8    tell me what the prison system has diagnosed.   I'll ask you

9    in a second if you agree with it, but -- even within the

10   prison system and whatever limitations they may or may not

11   have in there, would you tell the jury what have they

12   concluded is wrong or what do they say Ms. Solliday suffers

13   from?

14   A.   She's been diagnosed in the prison system by the prison

15   psychologist and psychiatrist as having major depressive

16   disorder recurrent, moderate, posttraumatic stress disorder,

17   substance abuse or alcohol in full remission.

18   Q.   Let me stop you there.   "Full remission," tell the jury

19   what that alcohol abuse thing, full remission, means.

20   A.   What it means is, no evidence of the -- no evidence of

21   the presence of this disorder for a clinically significant

22   amount of time; meaning, she has not used alcohol or

23   exhibited any evidence of alcohol addiction for, in this

24   case, it would have been years in order to meet the criteria.

25   Q.   So that's a previous condition she has dealt with?

1   A.   Correct.

2   Q.   All right.  Continue, please.

3   A.   Posttraumatic stress disorder is related to the

4   consequences of the sexual assault.  What it means is that

5   she meets the clinical criteria according to DSM-IV for

6   posttraumatic stress disorder.  It includes a change in her

7   affect.  "Affect" is the expression of mood or the expression

8   of feeling over a certain period of time.  It means she's

9   probably -- this particular thing does not tell us which

10   diagnostic criteria she meets, but we know that she has to

11   meet a certain number of them, that they have to have existed

12   over a period of time, and I can guess that they would be --

13   probably that her affect is labile, means she cries

14   frequently, that she's anxious and fearful.

15       She talked about being sort of disconnected immediately

16   after the assault where she sat on her bunk and didn't know

17   how long she had been sitting there for.  That is a

18   derealization or depersonalization period where she suddenly

19   feels not real and disconnected from herself.  That's a

20   common experience and one of the diagnostic criteria.  So she

21   meets the criteria for being currently -- for currently

22   having posttraumatic stress disorder as a consequence of the

23   sexual assault.

24   Q.   Okay.

25   A.   And then --

*Jennifer Dritt - Direct*

1   Q.   Now, what is your opinion of her diagnosis, her mental

2   health diagnosis?  Do you agree with that?

3   A.   I do agree with it.  It shows a major depressive disorder

4   recurrent, moderate; and you can have them co-occurring so

5   you can meet the diagnostic criteria for posttraumatic stress

6   disorder, which is related to an event; and then the major

7   depressive disorder, which means she meets the diagnostic

8   criteria for having a major depressive disorder, that's a

9   disorder that's recurrent, which means she's had several

10  episodes.  It looks to me like for some reason all of them

11  subsequently resolved, and I concur.

12  Q.   Okay.  And all of this is subsequent to the rape?

13  A.   Yes, sir.

14  Q.   And is it in your opinion that this condition, these

15  diagnoses for Ms. Solliday, are they permanent?

16  A.   I would say that -- there are a couple of things I

17  considered in thinking about how I would answer that

18  question.  One is that the consequences -- the symptoms of

19  these disorders, these disorders themselves last longer when

20  treatment isn't -- when they don't get treatment early on.

21  And based on when it happened, when she reported it, she did

22  not receive early treatment.

23      What I would say is that she will probably struggle with,

24  first of all, her major depressive disorder recurrent,

25  statistically, she is more likely to have episodes down the

1   road; and the fact that she's older than 50 and has had

2   several episodes already, specifically means she's more

3   likely to have those in the future.  There is no indication

4   that she had any of them prior to the assault.

5       So, yes, she will probably struggle with a major

6   depressive disorder for the rest of her life.

7       With respect to the posttraumatic stress disorder, she's

8   likely, without treatment, to experience episodes --

9   episodically experience those symptoms for the rest of her

10  life.  For example, she may be in remission, not experience

11  any depressive episodes, any anxiety, no panic attacks; but

12  if she were watching a TV show in which somebody were

13  assaulted, she could then reexperience, have intrusive

14  memories of the assault, reexperience the feelings related to

15  the assault, and need to seek intervention in order to help

16  those symptoms go into remission.  A very common sort of

17  course of the disease or the illness for most survivors.

18  Q.  Let me ask you about these.  I'm going to use -- it's

19  probably not the right medical mental health term, but let me

20  use the phrase "trigger points."  You mentioned a TV show.

21  Are there other trigger points that Ms. Solliday can expect

22  that will likely cause her to have a -- I think you used the

23  word "remission" or --

24  A.  Sure.  I mean, she could -- victims are often triggered

25  and, you know, might come back into treatment, often do come

*Jennifer Britt - Direct*

25

1   back into treatment down the road because of something in

2   their lives.  For Ms. Solliday, it might be something like,

3   when she's out -- either during or when she's out of prison,

4   having a male boss, having a job which requires her to be

5   isolated with a supervisor, being in small spaces.  She might

6   be -- would be likely to be triggered if she would hear about

7   an assault of someone that she knows and cares about, and

8   most of them know survivors.

9   Q.  Let me ask you this:  You did say you agree with the

10  basic assessments or diagnoses --

11  A.  I do.

12  Q.  -- rendered within the prison system.  I'm now going to

13  ask you slightly tougher questions.

14  A.  Uh-huh.

15  Q.  After reviewing those records, do you agree that the care

16  and treatment she got there was appropriate?

17  A.  No, I do not.

18  Q.  Would you tell the jury about that a little?

19  A.  Yes.  And I want to say, I'm not in the prison system,

20  I'm not in their shoes, and I don't know what they're

21  struggling with.  But what I do know is that I read through

22  them sequentially.  She went in -- when she was transferred

23  to -- she went from FCI to Miami to Dublin, which I believe

24  is in California, and requested individual therapy.  So eight

25  months or ten months later, she is fourth on the waiting list

*Jennifer Dritt - Direct*

1   for individual therapy.  So she asked immediately for

2   treatment, and ten months later she still isn't in individual

3   therapy.

4        They offered her group therapy, and group therapy is an

5   appropriate treatment modality for survivors.  The problem is

6   that it's typical to assess through individual -- a course of

7   individual treatment to assess somebody's fitness for group,

8   because if you're in a group treatment, it varies, it

9   provides a lot of support, and survivors find it very

10  helpful.  Individuals necessarily are more successful in

11  group therapy, but most people do, of course, 10, 12, you

12  know, at least, at the very least, some individual therapy

13  that assesses whether they are prepared to deal with what

14  comes up in group therapy.  Because in group therapy what

15  comes up is not only their own issues but everybody else's,

16  so they have to have the capacity to manage their own

17  feelings that come up as a consequence of what they're

18  talking about, and then to behave appropriately in a group

19  setting and provide support to the other group members, so --

20  Q.  Okay.  Let me just ask:  Basically, are there three

21  categories of treatment available for somebody in

22  Ms. Solliday's situation?  You have, I think you said,

23  individual therapy, group therapy, and medications.  I don't

24  know if you brought it up or if Ms. Solliday did.  Are those

25  basically the three options for care and treatment?

*Jennifer Dritt - Direct*

1    A.   Certainly.  And the medication is primarily to deal with

2    the symptoms.  It's not to deal with the underlying trauma.

3    But it typically will help folks, help survivors manage the

4    feelings that come up when they're dealing with the trauma.

5    Q.   Now let me ask you:  Is it your opinion -- or what is

6    your opinion on whether or not the fact that Ms. Solliday,

7    because she was in fear, did not report it right away, number

8    one; and, number two, that when she did report it, she only

9    got the care that you just outlined?  Do those two facts make

10   the care and treatment she will need in the future even

11   greater?

12   A.   I think it speaks to the fact that she will need care

13   longer.

14   Q.   And is this the early intervention that we mentioned

15   earlier?

16   A.   Yes.

17   Q.   So, if you don't have early intervention with the

18   appropriate modalities, that can cause your condition to be

19   more severe and last longer?

20   A.   Yes.  Outcomes are improved when intervention is quick in

21   terms of the long-term consequences of sexual assault which

22   are depression, anxiety, and substance abuse.

23   Q.   I think you mentioned -- did you mention panic attacks?

24   A.   Yes.  She is having panic attacks.

25   Q.   Okay.  Is that significant?

*Jennifer Dritt - Direct*

1   A.   Uh-huh.   Panic attacks are pretty -- significantly impair

2   those people who suffer from them and make activities of

3   daily living very difficult.   Not things like getting up and

4   brushing your teeth, but going to the grocery store or

5   working.

6   Q.   Okay.   And you said -- was there anything in there about

7   nightmares or problems sleeping?

8   A.   Well, she's had insomnia, yeah.   It looks to me, from

9   reading the case notes, that she has had insomnia for years

10  now subsequent to the assault, which affects -- well, she's

11  struggling currently with a very common symptom of

12  posttraumatic stress disorder, which is the inability to

13  concentrate, largely because people have intrusive memories

14  of the event; and then when you're sleep deprived because of

15  anxiety, then it's even harder to concentrate during the day.

16  Q.   Okay.   Now I want to try to quickly put some numbers on

17  some treatment.   Well, let me first ask:

18       Would you just give the outline of care and treatment

19  that you -- that you believe is appropriate for Ms. Solliday.

20  And I want you to take into account the assumption that she

21  will be committed to the correctional facility for another

22  five years.   So, I guess what I'm saying is, she'll have to

23  live with what she can get or not get for five years from the

24  prison system, and then it would turn over into a private

25  system of care and treatment.   So, with that assumption of

*Jennifer Britt - Direct*

1  the next five years being within the prison system, can you

2  outline for us a treatment plan?  And then I'll ask about the

3  cost.

4  A.  What would be appropriate would be for Ms. Solliday to

5  have at least weekly individual therapy and probably, given

6  the length of time that this is going on, group therapy as an

7  adjunct.  So both of them happening at the same time,

8  individual therapy initially, making sure she is stable

9  enough for group, and then group therapy.

10      Along with probably antidepressant and antianxiety

11  medication to help her manage the symptoms while she explores

12  the consequence of the assault on herself.  You know, long

13  term, you know, clearly she's got access to medication and

14  that's prescribed, but it looks like, you know, it's very

15  difficult to have -- to get individual therapy.

16      And what I do know about the prison system, if I may, is

17  that therapy is provided to people who are considered to be

18  the most risk either for hurting themselves or hurting other

19  people, unless it's a facility where it's specifically

20  intended to provide treatment, like treatment for sex

21  offenders.

22  Q.  Okay.  Let's assume that Ms. Solliday is likely to get

23  care and treatment somewhat similar to what you have seen her

24  getting up to this date, and it won't get any better or any

25  worse.

1      With that in mind, would you give us the specifics of a

2   plan, that three-, five-year plan, what she will need the

3   rest of her life that would start at the five-year mark, once

4   she is able to seek her own private care?

5   A.   Sure.   What I would recommend is individual therapy at

6   least once a week, then to twice a week, depending on, you

7   know, the assessment of the clinician, for three to five

8   years, with the availability of a drop-in group for

9   survivors; and medication to deal with anxiety and

10  depression.

11  Q.   Let me ask you about the individual therapy.   Twice a

12  week, three to five years, as an estimate, what do these

13  sessions generally cost?

14  A.   Well, if you're seeing a licensed clinical social worker,

15  probably $90 an hour.   If you're seeing a psychologist or

16  psychiatrist, seeing a psychologist, 140 to $150 an hour;

17  psychiatrist sometimes charge $190 an hour, but they don't

18  typically view treatment in the same way.

19  Q.   Okay.   Let's not use the psychiatrist.   Let's use the

20  others.   That would be $90 to $150?

21  A.   Yes.   Do you mind if I refer to my notes?

22  Q.   No.   Please do.   So that's twice a week, three to five

23  years.   What happens after five years?

24  A.   Well, after five -- you know, most people are not

25  necessarily going to be in individual therapy every week

1  after five years.  What we're talking about is a substantial

2  change in how someone functions.  We're looking at usually

3  three to five years of intense individual therapy.  When

4  we're talking about a personality disorder, we talk about ten

5  years.

6      But I do want to point out, she's got no diagnosis of a

7  personality disorder, underlying personality disorder.  What

8  she has is something completely related to the sexual

9  assault.

10     So three to five years.  And then after that, it's a

11  little bit like driving down and taking a road trip where

12  you're going to run out of gas at some point and pull into

13  the station.  It happens with survivors, children or

14  adolescents, or adults, you're going to run out of gas.

15  Everything is going to result in a milestone that's going to

16  restimulate them, you know, kids get the -- they're sexually

17  assaulted at six, they become an adolescent, and have to go

18  with, you know, their ego is going to manage both the body

19  and sexuality, and their experience being sexually assaulted

20  is confusing for them, so they have to go back for a pit

21  stop.  For adults, it's the same thing.

22  Q.  She'll have flare-up care.  Sometimes in physical

23  injuries they use "palliative."

24  A.  Yes.

25  Q.  As needed, when these things trigger or flare up?

1    A.   Yes, and that's standard for survivors.

2    Q.   Okay.  And I don't want to torture the jury with math,

3    but you and I have done a little bit of math as we prepared

4    for trial.  Let's try to get to some basic estimates.

5        For the individual therapy for this three to five years,

6    is $2,000 a year a reasonable estimate for the individual

7    therapy during the intense period?

8    A.   No.  If you're talking about, say, she's seeing a

9    licensed clinical social worker, and we're going to assume

10   four of those weeks, she doesn't see somebody, the therapist

11   takes two weeks in August, and she doesn't see someone for

12   another two weeks because she's on vacation, times three

13   years, you're talking about $13,000.  If we're talking at

14   five years, we're at, you know, $22,000.

15   Q.   So, if we get the average of that, we're at about 17?

16   A.   Uh-huh.

17   Q.   Okay.

18   A.   If she sees a psychologist, it's substantially more.

19   Q.   Let's use the lower rates.  All right.  Approximately

20   17,000 for individual therapy?

21   A.   For individual therapy alone.

22   Q.   And that's in the three- to five-year plan?

23   A.   Yes.

24   Q.   Can you give us a reasonable estimate of the palliative

25   care she will need for flare-ups after that for the rest of

*Jennifer Dritt - Direct*

1  her life?

2  A.  Maybe, say, 10 to 15 sessions, somewhere in the range of

3  a thousand to $2,000 a year, probably.

4  Q.  Per year?

5  A.  Probably.  I mean, it depends.  It really depends.

6  Q.  That's fine.  So --

7  A.  Maybe a thousand dollars a year.

8  Q.  I'm sorry?

9  A.  Maybe a thousand dollars a year.

10  Q.  A thousand a year.  Okay.

11  A.  Assuming she has a pre-existing relationship and that

12  therapist doesn't have to go into a three-hour assessment.

13  She knows her, and then she can call the therapist and say,

14  "Gosh, I'm really having a hard time.  Can I come back in for

15  five or ten sessions?"

16  Q.  Got it.  So at the lower amounts, not the psychiatry

17  amounts, but the psychologist, mental health counselor

18  amounts, and assuming no bizarre or unusual circumstances

19  that would intensify what she needs, we're looking at -- for

20  individual therapy, we're looking at approximately $17,000

21  for the acute period, three to five years; and then a

22  thousand dollars per year thereafter?

23  A.  Approximately; yes, sir.

24  Q.  Now, I understand for group, that's one of the three

25  treatment options, the second one, group therapy, I

1  understand that sometimes those services are available for

2  free in communities --

3  A.   Yes.

4  Q.   -- is that correct?

5  A.   That's correct.  And, if you've -- I don't know where she

6  would be living.  But if you've got a good rape crisis center

7  in your local community, most often services to survivors are

8  free of charge.  They don't do long-term individual

9  treatment, because they can't handle the demand.  They are

10 not really a private practice.  But they can drop in -- after

11 an assessment, they can come to a group on a regular basis,

12 usually, and the group is free.

13 Q.   Is the fair estimate for her group therapy over her

14 lifetime zero?

15 A.   Sure.

16 Q.   We'll assume these associations and organizations --

17 A.   Right.

18 Q.   -- are available in her community.

19 A.   Now, if you're in a community in which the rape crisis

20 center does a bad job, and that happens, you know, then you

21 don't have group available, then you might have to -- you

22 might find a private clinician that is running a group for

23 survivors.  That would be costly.  It doesn't cost what

24 individual therapy costs, but you would have to pay for it.

25 Q.   Okay.  Medications.  Are you familiar -- I think you said

1  already that you are familiar with the type of medications

2  given to victims in a position of Ms. Solliday.

3  A.  Yes, sir.

4  Q.  Okay.  What are they and what do they normally cost?

5  A.  Well, basically, she would probably -- appropriate

6  treatment for her would be an antianxiety medication and an

7  antidepressant.  Some antidepressants have antianxiety

8  properties, some of them don't.  The new generation of

9  antidepressants, which work pretty well for people, they are

10  not yet -- don't have generic versions.  So those, you know,

11  we're talking about probably 90 -- low end would be $90 a

12  month, maybe $150 a month on the low end for one

13  prescription.  We're talking about $1100 a year up to $2200 a

14  year for one prescription.  If she's taking antianxiety

15  medication and an antidepressant, maybe $4500 a year for

16  medications, assuming she has health insurance that pays for

17  it.

18  Q.  Okay.

19  A.  Substantially more if --

20  Q.  So you're actually giving us the reduced --

21  A.  The reduced rate.  The prices are outrageous, if you

22  don't have insurance.

23  Q.  All right.  We'll assume she's lucky, she has insurance.

24  At those rates, we're talking $4500 a year for both those

25  medications?

1    A.   They're not cheap, they're really not cheap.   But that's

2    at the high end.

3    Q.   What's the medium?   I want just medium numbers.   I don't

4    want low; I don't want high.   I just want a medium sort of

5    expected average.

6    A.   She might pay $1500 a year for medication.

7    Q.   Fifteen?

8    A.   Roughly.

9    Q.   Okay.   Have we covered Ms. Solliday's diagnosis, her

10   recommended treatment, and the cost for that treatment?

11   A.   We have.

12   Q.   Okay.   Have all of the opinions you've expressed today

13   been given with a reasonable degree of medical certainty; and

14   by "medical," I mean mental health therapist?

15   A.   Yes, sir.

16   Q.   Ms. Dritt, the jury has an important job to do probably

17   shortly after lunch today, and I wanted to know if there's

18   anything else you think they should know to do their job

19   about Ms. Solliday or about custodial rape.

20   A.   I think it's -- I would like to encourage you to take

21   very seriously the consequences of sexual assault on people's

22   psychological well-being and the impact of that assault on

23   their lives for the rest of their life.   It's not a small

24   thing.   And the impact of sexual assault really affects

25   people's family, it affects their children, their

1    relationship with their husband, or their wives.  It affects

2    their productivity.  And all of that has been documented by

3    the research.

4        It affects -- it will affect -- has affected already the

5    sense of herself and will affect the sense of herself for the

6    rest of her life.  I don't mean to say that she's damaged,

7    but she's wounded, and that wound is a wound that never goes

8    away.  A person who has been sexually assaulted will never

9    again not be a person who was not sexually assaulted.  It is

10   something that cannot be undone.  And the consequences of it

11   are substantial, which is why our former President Bush

12   established the National Prison Rape --

13            THE COURT:  Let's just stop.  You need to ask another

14   question about the case.

15            THE WITNESS:  Okay.

16            MR. FRANK:  I'm just reviewing my notes, Your Honor.

17   I just need a second.

18            THE COURT:  All right.

19       (*Pause.*)

20            MR. FRANK:  Your Honor, I have no further questions.

21            THE COURT:  All right.  Thank you, Ms. Dritt.  You

22   may step down.

23            (End of excerpt.)

24                    *  *  *  *  *  *  *  *  *

25

1

2

3    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
4    redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
5    transcript.

6

7

8    Judy A. Gagnon                        9/5/2017
     Judy A. Gagnon, RMR, FCRR            Date
9    Official U.S. Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25